John DOE 76C, Respondent,

v.

ARCHDIOCESE OF SAINT PAUL AND MINNEAPOLIS, Appellant,

Diocese of Winona, Appellant.

No. A10–1951.

Supreme Court of Minnesota.

July 25, 2012.

Jeffrey R. Anderson, Patrick W. Noaker, Michael G. Finnegan, Jeff Anderson & Associates, P.A., Saint Paul, MN, for respondent.

Thomas B. Wieser, Jennifer R. Larimore, Meier, Kennedy & Quinn, Chtd., Saint Paul, MN, for appellant Archdiocese of Saint Paul and Minneapolis.

Anna Restovich Braun, George F. Restovich & Associates, Rochester, MN, for appellant Diocese of Winona.

Michael J. Ford, Cally R. Kjellberg, Quinlivan & Hughes, P.A., Saint Cloud, MN, for amicus curiae False Memory Syndrome Foundation.

John D. Lamey, III, Lamey Law Firm, P.A., Oakdale, MN, for amicus curiae Leadership Council on Child Abuse and Interpersonal Violence.

Bruce Jones, Faegre & Benson LLP, Minneapolis, MN, for amicus curiae Minnesota Religious Council.

Thomas S. Deans, Michelle D. Kenney, Knutson, Flynn & Deans, P.A., Mendota Heights, MN, for amicus curiae Minnesota School Boards Association.

Amy J. Russell, Winona, MN, for amici curiae National Child Protection Training Center and National Center for Victims of Crime.

Daniel A. Haws, Stacey E. Ertz, Murnane Brandt, Saint Paul, MN, for amicus curiae Minnesota Defense Lawyers Association.

## OPINION

ANDERSON, G. BARRY, Justice.

This appeal asks us to determine whether John Doe 76C's ("Doe") expert testimony on the theory of repressed and recovered memory offered to prove a disability delaying the accrual of his otherwise untimely negligence and fraud claims is admissible. Doe claims the Archdiocese of Saint Paul and Minneapolis and the Diocese of Winona ("Dioceses") are liable for his damages resulting from alleged sexual abuse in the early 1980s by a priest under the Dioceses' control. Doe filed this action on April 24, 2006; because his claims are subject to 6–year statutes of limitations, Doe's claims are untimely unless they accrued after April 24, 2000. *See* Minn.Stat. §§ 541.05, subd. 1(6), 541.073 (2010). To support his argument that accrual of his claims was delayed, and that his action was therefore timely, Doe intended to offer general expert testimony on the theory of repressed and recovered memory. The district court concluded that Doe's expert testimony was inadmissible under the *Frye–Mack* standard, making Doe's claims untimely, and granted the Dioceses summary judgment. *See Frye v. United States,* 293 F. 1013, 1014 (D.C.Cir.1923); *State v. Mack,* 292 N.W.2d 764, 768 (Minn. 1980). The court of appeals reversed the summary judgment order, concluding that Doe's expert testimony might be admissible under Minn. R. Evid. 702. We conclude that Doe's expert testimony on the theory of repressed and recovered memo-

ry, offered to prove a disability delaying the accrual of a cause of action, is inadmissible under Minn. R. Evid. 702 because it lacks foundational reliability and that as a result Doe's claims are untimely. We therefore reverse the court of appeals.

## I.

Doe alleges that Father Thomas Adamson ("Fr. Adamson") sexually abused him on four separate occasions in 1980 or 1981, when Doe was a teenager. Doe also alleges that the Dioceses knew that Fr. Adamson was a danger to children before Fr. Adamson was assigned to Doe's parish in 1981. Doe claims that the Dioceses are liable for damages stemming from this alleged sexual abuse on two general theories: first, that the Dioceses negligently allowed the abuse to occur, Minn.Stat. § 541.073, subd. 3, and second, that the Dioceses fraudulently concealed the fact that Fr. Adamson was a danger to children from Doe. Minn.Stat. § 541.05, subd. 1(6).

It is undisputed that Fr. Adamson has a history of sexually abusing children and that the Dioceses did not make that history known to the public until the mid–1980s. It is also undisputed that Fr. Adamson and Doe became close acquaintances after Fr. Adamson was assigned to Doe's parish in 1981. Doe claims that Fr. Adamson sexually abused him on four separate occasions in 1980 or 1981. According to Doe, the alleged incidents were brief (each lasting a few seconds) and Doe was fully clothed for three of them. Importantly, Doe claims that, at some unspecified time after these incidents, he repressed his memories of the alleged sexual abuse.

Fr. Adamson's history of abusing children was highly publicized in the mid–1980s when some of his victims sued the Dioceses. *See Mrozka v. Archdiocese of Saint Paul & Minneapolis,* 482 N.W.2d

806 (Minn.App.1992). The local news media extensively covered the allegations against Fr. Adamson in the late–1980s and early–1990s; newspapers ran over 130 articles about Fr. Adamson's wrongful conduct and the Dioceses admitted responsibility for the abuse. *See, e.g.,* Donna Halvorsen, *Two Catholic Dioceses Admit Responsibility for Sexual Abuse by Priest,* Star Tribune, Nov. 3, 1990, at 01A. Doe's parents learned about the allegations against Fr. Adamson and the Dioceses in the 1980s and discussed the allegations with Doe. Doe testified that he was aware of the sexual abuse problem in the Catholic Church by the 1990s.

Despite his actual knowledge of the sexual abuse problem in the Catholic Church generally, and Fr. Adamson's history of sexual abuse specifically, Doe claims that he did not have reason to bring his claims until 2002 because he repressed the memories of Fr. Adamson's alleged sexual abuse from some unspecified time after the abuse occurred until 2002. Doe testified that in the summer of 2002 he had a series of flashbacks to Fr. Adamson touching Doe's upper thigh. After these flashbacks, Doe began therapy to deal with the rage and anger that he felt because of the memory. After Doe started therapy, he claims that he remembered three other incidents of abuse.

On April 22, 2009, Doe met with Father Thomas Doyle and told him that, at the time of the alleged abuse, he felt emotionally paralyzed, shocked, and isolated, and that at the time of the alleged abuse he felt deathly afraid to tell anyone about the abuse because of his family's close relationship with the Catholic Church and Fr. Adamson.

## II.

Doe filed this action on April 24, 2006, claiming that the alleged abuse has, and will continue to, cause Doe emotional and psychological damage, mental health expenses, a loss of income, and a loss of earning capacity. Doe claims that the Dioceses are liable for these damages under theories of negligence, negligent supervision, negligent retention, vicarious liability, fraud, and fraudulent intentional non-disclosure. All of Doe's claims are subject to 6–year statutes of limitations.[1]

Doe argues that his claims based on alleged abuse in the early 1980s are timely because he repressed the memory of the abuse until the summer of 2002 and, therefore, he could not have known that he had been sexually abused until that time. In order to prove that he could not know or have reason to know that he had claims until 2002, Doe intended to offer expert testimony on the psychological theory of repressed and recovered memory.

---

**1.** The statute of limitations on actions for damages based on personal injury caused by sexual abuse is "six years [from] the time the plaintiff knew or had reason to know that the injury was caused by the sexual abuse." Minn.Stat. § 541.073, subd. 2(a). As a matter of law, one is injured if sexually abused. *Blackowiak v. Kemp,* 546 N.W.2d 1, 3 (Minn. 1996). Nevertheless, if the plaintiff is a minor at the time of the alleged abuse he lacks the ability to know or have reason to know that he was sexually abused, and the 6–year statute of limitations does not begin to run until the person reaches the age of 18.

*D.M.S. v. Barber,* 645 N.W.2d 383, 389 (Minn. 2002).

The 6–year fraud statute of limitations begins to run when the aggrieved party discovers the facts constituting the fraud. Minn. Stat. § 541.05, subd. 1(6). Discovery of the fraud is analyzed under the reasonable person standard. *See Bustad v. Bustad,* 263 Minn. 238, 242, 116 N.W.2d 552, 555 (1962). The facts constituting the fraud are deemed to have been discovered when they were actually discovered or "by reasonable diligence, should have been discovered." *Toombs v. Daniels,* 361 N.W.2d 801, 809 (Minn.1985).

### Frye–Mack Hearing

The Dioceses requested a *Frye–Mack* hearing to determine the admissibility of Doe's expert testimony regarding repressed and recovered memories. The *Frye–Mack* standard governs the admissibility of expert testimony that "involves a novel scientific theory." Minn. R. Evid. 702; *Goeb v. Tharaldson*, 615 N.W.2d 800, 814 (Minn.2000). Before *Frye–Mack* expert testimony can be admitted, the proponent of the evidence must establish that the underlying scientific evidence "is generally accepted in the relevant scientific community," and that "the particular scientific evidence in [the case has] foundational reliability." *Goeb*, 615 N.W.2d at 814. The Dioceses argued that Doe's evidence relating to the theory of repressed and recovered memory was "novel" "scientific" evidence that was neither generally accepted in the relevant scientific community nor foundationally reliable in an individual case and, therefore, inadmissible under the *Frye–Mack* standard. Doe argued that a *Frye–Mack* hearing was not required because repressed and recovered memory theory is not novel.[2]

The district court granted the Dioceses' motion for a *Frye–Mack* hearing to determine the admissibility of "the theory of repressed and recovered memory as a basis for tolling the statute of limitations." The court correctly concluded that, while repressed memory was a basis for the legislature's enactment of the delayed discovery statute, our court had not yet accepted the theory as a basis "for tolling the statute of limitations for an undetermined period." Because we had yet to scrutinize the theory under the *Frye–Mack* standard to decide whether it is generally accepted in the relevant scientific community and there is a "significant body of scientific research on both sides of this issue," the district court concluded that a *Frye–Mack* hearing was required.

The district court then conducted a 3–day *Frye–Mack* hearing in June 2009. Doe presented testimony from Dr. James A. Chu, M.D., and Dr. Constance Dalenberg, Ph.D., who testified that repressed and recovered memory theory is generally accepted in the relevant scientific community and foundationally reliable. The Dioceses presented testimony from Dr. Harrison G. Pope, Jr., M.D., Dr. William M. Grove, Ph.D., and Dr. Elizabeth F. Loftus, Ph.D.[3] The Dioceses' experts testified that repressed and recovered memory theory is not generally accepted in the relevant scientific community and is foundationally unreliable. Because the testimony from the experts at the *Frye–Mack* hearing was crucial to the court's conclusion that the theory of repressed and recovered memory lacks foundational reliability, we summarize that testimony in some detail.

### Dr. Dalenberg

Dr. Dalenberg, the Director of the Trauma Research Institute and a full Professor of Psychology at the California School of Professional Psychology, testified for Doe. According to Dr. Dalenberg, patients with

---

**2.** It is worth noting that while Doe argued to the district court that a *Frye–Mack* hearing was unnecessary, he did not argue that *Frye–Mack* was the wrong standard under which to assess the admissibility of his proffered expert testimony.

**3.** All of the experts who testified at the *Frye–Mack* hearing have impeccable credentials and neither party argues on appeal that the experts retained by the other party do not qualify as experts. Because qualification as an expert is not an issue as to any of the witnesses in this case, we have omitted detailed discussion of the expert witnesses' qualifications.

various types of trauma sometimes repress their memories of the trauma.

Dr. Dalenberg presented 328 peer-reviewed scientific research articles purporting to show that repressed and recovered memory exists and that the theory is scientifically reliable. Generally, Dr. Dalenberg testified that researchers in this area consistently find that a small percentage of people who experience trauma totally repress recall of that trauma and that, years later, those people can suddenly and accurately remember the trauma. According to Dr. Dalenberg, the sheer volume of studies finding people with repressed and recovered memories is strong evidence that repressed memories occur.

Dr. Dalenberg testified that of all of the research studies she was aware of that looked for patients with repressed memory, none had ever had a "zero response." To put it another way, no study that searched for patients with repressed and recovered memories had ever failed to find at least one patient who claimed to have repressed and later recovered a memory. On the other hand, Dr. Dalenberg consistently seemed to equate "forgetfulness" with "memory repression." For example, when discussing a well-known research study that purported to find that 19% of the participants suffered from repressed memory, Dr. Dalenberg stated that the study concluded that some participants "*forgot* the abuse for a period of time and later the memory returned." (Emphasis added). Dr. Dalenberg's lack of differentiation between "forgetting" and "repression" lends credence to the Dioceses' experts, who claim that repression is not distinct from other types of forgetting.

Dr. Dalenberg testified that repressed memories not only exist, but that, when recovered, those memories are accurate. Some of the research articles Dr. Dalenberg presented were "accuracy studies."

According to Dr. Dalenberg, accuracy studies measure how accurate repressed memories are as compared to normal, continuous memories. Dr. Dalenberg testified that the accuracy studies proved that repressed memories are as accurate as continuous memories because people make errors in both repressed memories and normal, continuous memories at about the same rate. On the other hand, the Dioceses effectively cross-examined Dr. Dalenberg on the issue of repressed memory accuracy. Under examination, Dr. Dalenberg conceded that she could not give, and did not know how an "error rate" could be calculated as to how often or how accurately people repressed and recovered their memories.

As to whether the theory of repressed and recovered memory is generally accepted in the relevant scientific community, Dr. Dalenberg testified affirmatively but noted that there was a debate over the cause of repressed and recovered memory. Dr. Dalenberg disputed the importance of the debate, however, and compared it to an argument over the causes of cancer in that, just because scientists do not know what causes cancer does not mean that cancer does not exist.

### Dr. Chu

Dr. Chu, a psychiatrist and associate professor of Psychiatry at Harvard Medical School who has treated psychological trauma patients for 30 years, testified for Doe. Dr. Chu testified that, during his 30 years of practice, he has seen "[d]ozens if not hundreds" of patients who have had repressed and recovered memories. Dr. Chu testified that it was important to consider the viewpoint of clinicians when considering the theory of memory repression because clinicians see a wide variety of patients with recovered memories while researchers see only a small group of patients.

Dr. Chu was on the task force that added a diagnosis for repressed and recovered memory to the DSM.[4] Dr. Chu testified that the DSM is the diagnostic "Bible" in psychiatry, and that before a diagnosis is included in the DSM it must be firmly rooted in peer-reviewed scientific research. Dr. Chu also testified that inclusion of repressed and recovered memory as a diagnosis in the DSM is very strong evidence of the general acceptance of the theory.

At the same time, however, Dr. Chu testified that there is a "great debate" about the whole concept of repressed and recovered memory. Unlike Dr. Dalenberg, who testified that the debate was about what causes repression, Dr. Chu testified that the debate in the scientific community is "a heated debate as to whether repressed memory exists." Finally, as to the accuracy of alleged recovered memories, Dr. Chu testified that the DSM "basically says you can't—*there is no current method for actually establishing the accuracy of recovered or retrieved memories without corroborating evidence.*" (Emphasis added).

### Dr. Pope

Dr. Pope, a Professor of Psychiatry at Harvard Medical School, testified for the Dioceses. Dr. Pope testified that the theory of repressed and recovered memory is "highly controversial" and that "[s]ome have called it the most heated debate currently in psychiatry." According to Dr. Pope, the theory is not generally accepted in the relevant scientific community because something cannot be both generally accepted and highly controversial and debated.

Dr. Pope testified, generally, about the nature of debate in the psychological community. According to Dr. Pope, "psychiatry has been filled with little offshoots where [a] theory would acquire popularity for a period of time and then there would be a cluster of people very invested in it," and then the theory would fade. As an example, Dr. Pope described that as late as the 1970s, psychology schools taught that schizophrenia often was caused by an individual's environment and that "you could cure schizophrenia with talk." Dr. Pope explained that those views faded over time and that today it is conceded that schizophrenia is a biological condition that cannot be talked away. Dr. Pope strongly implied that the same scenario was playing out regarding the theory of repressed and recovered memory.

Dr. Pope also stressed the importance of differentiating repressed and recovered memory theory from other psychological memory processes. The theory of repressed and recovered memory is that "someone could have a terrible trauma and then literally be unable to remember it for a period of time," such that "I could walk up to [that person] 5 years later and say, do you remember [an event], and [that person] would look me straight in the eye and say, no, I don't remember that." Dr. Pope explained that this theory is different from:

(1) ordinary forgetting, in which someone "forgets" something but would be perfectly capable of remembering if reminded; (2) not thinking about some-

---

**4.** The Diagnostic and Statistical Manual of Mental Disorders (DSM) is a tool used mainly by clinical psychologists and psychiatrists (mental health professionals whose primary work is treatment of patients rather than research) to diagnose mental illness. Repressed and recovered memory is identified as "dissociative amnesia" in the latest version of the DSM. Am. Psychiatric Ass'n., *Diagnostic and Statistical Manual of Mental Disorders* 520–23 (4th ed., text rev. 2000) (DSM–IV–TR).

thing for a long time; (3) incomplete encoding of a traumatic event, which is "if I threaten you with a gun, you will remember exactly what the gun looked like, but you may not remember what color shirt I was wearing"; (4) organic amnesia, which is "when you get knocked out in a car accident and you have no memory of what happened, or when you get drunk and you have a blackout"; (5) psychogenic amnesia, a "very rare phenomenon where someone wakes up in a hotel room and has no idea what their name[ is] or who they are"; (6) childhood amnesia, which is when an event occurs when a child is too young to remember it; and (7) "nondisclosure," in which a subject may remember a traumatic event perfectly well but not want to disclose it to a researcher. *See* Pope Slideshow, Def.'s Ex. 1003, June 2, 2009. According to Dr. Pope, part of the controversy over repressed and recovered memory theory stems from the fact that psychologists often claim that a patient has repressed and recovered memories when that patient's memory problems can be explained just as easily by one of the other, accepted, types of memory loss. While all scientists agree that there are many types of memory loss, Dr. Pope testified that scientists do not agree that repressed and recovered memories exist.

Dr. Pope disagreed with Doe's experts that inclusion of repressed and recovered memory as a diagnosis in the DSM demonstrates that the theory is generally accepted. According to Dr. Pope, inclusion in the DSM–IV–TR does not demonstrate general acceptance because the DSM–IV–TR itself cautions against its use in legal settings, it is not a scientific work, it also lists repressed and recovered memory as a "feigned" symptom of other diagnoses, and because its diagnoses are added by committees interested in the area of the diag-

nosis and therefore may not be representative of the scientific community at large.

Dr. Pope did not believe that the existence of repressed and recovered memories had been proven by scientific studies. He reviewed 77 studies involving more than 11,000 individuals who had experienced a wide variety of traumatic events (such as natural disasters and rape) and testified that, out of all of the studies, none contained a single, well-documented case of memory loss that could not be explained by some other memory process. Similarly, Dr. Pope testified that, even if someone assumed that repressed and recovered memories existed, there is no way to determine whether a person is actually suffering from memory repression or feigning the condition. Dr. Pope also testified that there is "voluminous" literature openly questioning the existence of repressed and recovered memory.

Finally, and most importantly, Dr. Pope testified that all of the 328 peer-reviewed scientific research articles submitted by Dr. Dalenberg purporting to prove the existence of repressed and recovered memories have serious methodological flaws. The most serious flaw Dr. Pope noted was that "there [is] no way to validate that [the participants stating that they suffered from memory repression] were literally unable to remember the event." When asked whether the sheer volume of studies purporting to prove the existence of repressed and recovered memories was persuasive, Dr. Pope said that it was not persuasive because the studies' methodological flaws made them worthless, stating that "a hundred times zero is still zero." Because of these serious methodological flaws, Dr. Pope opined that the theory of repressed and recovered memory is not based on science that is foundationally reliable.

### Dr. Grove

Dr. Grove, an Associate Professor at the University of Minnesota and an expert in the scientific methodology of psychology, also testified for the Dioceses. Dr. Grove testified that the theory of repressed and recovered memory has not been scientifically proven because it has not been well demonstrated in research that people can entirely repress memories of traumatic events and that the scientific community has not formed a consensus as to whether repression is even possible.

Like Dr. Pope, Dr. Grove testified that the research studies purporting to prove that repressed and recovered memory exists "are not of sufficiently high methodological quality" to be reliable. Dr. Grove also stated that no scientific study has established that recovered memories are accurate. Moreover, Dr. Grove testified that there is no way, currently, to tell whether a person claiming to have repressed memories is remembering an actual or false memory because, if a person truly believes that he has repressed a memory (even if the memory can actually be shown to be false), he will exhibit sincerity and "absolutely and confidently" believe the memory is real. On cross-examination, Dr. Grove reaffirmed that all of the studies relied upon by Doe's expert, Dr. Dalenberg, are flawed because they do not sufficiently differentiate between a subject losing all memory of an event with a subject just unable to recall certain details of an event.

Dr. Grove also cautioned against placing too much weight on clinical diagnoses of repressed and recovered memories by even highly experienced clinical psychologists. Dr. Grove testified that there is little evidence supporting the proposition that a more experienced clinical psychologist will provide diagnoses that are more accurate. According to Dr. Grove, an assertion that "if [a clinician] has seen a lot of patients, this extra experience makes [that clinician] more of an expert[ and] more accurate in [his] predictions and clinical judgments" is unsupported because "the research in this area shows little or no correlation between the amount of experience that a clinician has had and the accuracy of their judgments when it comes to behavioral science like psychology and psychiatry."

### Dr. Loftus

Dr. Loftus, a Distinguished Professor of Psychology and Social Behavior; Criminology, Law, and Society; and Cognitive Science at the University of California, Irvine, testified for the Dioceses. Dr. Loftus testified that the theory of repressed and recovered memory is "massively controversial." Because of this massive controversy, Dr. Loftus stated that she did not "see how anyone can, with a straight face, say that there is general acceptance [of the theory]." Like the Dioceses' other experts, Dr. Loftus testified that the number of studies produced by Doe's experts was unconvincing because the studies were of poor quality. Dr. Loftus also testified that the studies relied upon by Doe are seriously methodologically flawed and thus do not support the theory of memory repression.

Dr. Loftus also discussed her research on "false memory" and memory distortion. Dr. Loftus has conducted numerous studies where she was able to implant a false memory of a childhood event into a subject's mind—Dr. Loftus successfully persuaded subjects to believe, variously, that they had been left at a mall, attacked by an animal, or witnessed a demonic possession when, in fact, none of these events had occurred. Importantly, Dr. Loftus testified that, once implanted in the subject, a false memory "can be held with confidence, expressed with detail, and even experienced [with] emotion" and that it is

"virtually impossible without independent corroboration to tell whether you are dealing with a real memory or one that is a product of some other process." Dr. Loftus also testified that media coverage of an event and other post-event suggestions could distort memory. Dr. Loftus stated that the amount of media coverage in the cases involving Fr. Adamson, the questioning of Doe by his parents in the 1980s about abuse by Fr. Adamson, and Doe's use of questionable therapy techniques to deal with his memories were all post-event suggestions that could have distorted Doe's memory.

On cross-examination, Dr. Loftus conceded that it is possible that there is a psychological mechanism that causes repression; she stressed, however, that she has seen no evidence of it. Dr. Loftus also conceded that many studies cited by Doe have patients who show signs of amnesia, but disagreed that any of the studies showed evidence of anyone with total repression for an event.

*The District Court Excludes Doe's Expert Testimony and Grants Summary Judgment*

The district court excluded Doe's expert testimony on the theory of repressed and recovered memories because Doe failed to show that the theory is generally accepted in the relevant scientific community and failed to show "that the theory of repressed and recovered memory is reliable and trustworthy based on well-recognized scientific principles because of the significant methodological flaws in the studies presented by [Doe] in support of that theory and the lack of any test to show reliability." The court also concluded that inclusion of repressed and recovered memory as a diagnosis in the DSM does not establish general acceptance.

With respect to its conclusion that the theory of repressed and recovered memory is not generally accepted in the relevant scientific community, the district court found that both psychological researchers and clinicians were members of the relevant scientific community and that, generally, clinicians widely accepted the concept of repressed and recovered memories and researchers widely did not. The court agreed with the Dioceses' witnesses, and Doe's witness Dr. Chu, that there was a great debate in the psychological community about whether the concept was valid. It recognized that Doe's best argument for general acceptance of the theory was the inclusion of repressed and recovered memory as a diagnosis in the DSM, but found that inclusion in the DSM–IV does not equate to general acceptance for several reasons: the Supreme Court recognized that a diagnosis in the DSM, "may mask vigorous debate within the profession about the very contours of the mental disease itself," *Clark v. Arizona*, 548 U.S. 735, 774, 126 S.Ct. 2709, 165 L.Ed.2d 842 (2006); the DSM is not a scientific paper; psychiatrists disagree about whether repressed and recovered memories should appear in the DSM; other courts have recognized that the DSM is an evolving document; and the DSM itself cautions against use in legal settings due to the "significant risks that diagnostic information will be misused or misunderstood [and that] [t]hese dangers arise because of the imperfect fit between the questions of ultimate concern to the law and the information contained in a clinical diagnosis." Am. Psychiatric Ass'n, *Introduction to Diagnostic and Statistical Manual of Mental Disorders*, at xxxii-xxxiii (4th ed., text rev. 2000).[5] Ultimately, because of the serious

---

5. The district court's, and the Dioceses' experts', criticism of the DSM is shared by many in the field of psychology, including Dr. Allen Frances, the former chair of the DSM

debate within the relevant scientific community, the court concluded that the theory of repressed and recovered memory was not generally accepted.

With respect to its conclusion that the theory of repressed and recovered memory lacks foundational reliability, the district court stated that the research relied upon by Doe did not "provide sufficient information about the scope of the subject's purported amnesia and that the accuracy of the recovered memories has not been scientifically established." The court agreed with the Dioceses' experts that all of the studies that purported to establish the existence of repressed and recovered memories had serious methodological flaws. The court was also troubled by the fact that recovered memories cannot be shown to be accurate in the absence of independent corroboration. Accordingly, the court excluded, as not foundationally reliable, evidence of repressed and recovered memories offered for the purpose of establishing a disability to toll a statute of limitations.

After the *Frye–Mack* hearing, the Dioceses moved for summary judgment. The district court granted the Dioceses summary judgment because it concluded that all of Doe's claims were barred by the applicable statutes of limitations. The court concluded that because Doe could not establish a legal disability tolling the statute of limitations, Doe's negligence, negligent supervision, negligent retention, and vicarious liability claims were barred by Minn.Stat. § 541.073, subd. 2. The court also concluded that Doe's fraud claims were barred by Minn.Stat. § 541.05, subd. 1(6), because there was overwhelming evidence that Doe could have discovered, with reasonable diligence, the facts constituting the claimed fraud in the 1980s.

## Court of Appeals Reverses and Remands

The court of appeals reversed and remanded the district court's summary judgment order. The court of appeals concluded that the district court erred by applying the *Frye–Mack* standard to Doe's expert testimony on repressed and recovered memories because it was akin to "syndrome" evidence. *Doe v. Archdiocese of Saint Paul & Minneapolis,* 801 N.W.2d 203, 207–08 (Minn.App.2011).

The court of appeals relied heavily on *State v. MacLennan,* 702 N.W.2d 219 (Minn.2005), in reaching this conclusion. *Doe,* 801 N.W.2d at 207–08. In *MacLennan,* we recognized a difference between "physical sciences" and "theories and assumptions that are based on the behavioral sciences," concluding that "expert testimony on syndromes, unlike DNA evidence or other physical science, is not the type of evidence that the analytic framework established by *Frye–Mack* was designed to address." *MacLennan,* 702 N.W.2d at 231, 233. Because the theory of repressed and recovered memory is not based in physical science, the court of appeals was persuaded that the *Frye–Mack* standard should not be used here. *Doe,* 801 N.W.2d at 207–08.

Because it concluded that the district court erred in applying the *Frye–Mack* standard, the court of appeals reversed and remanded the evidentiary ruling on the admissibility of expert testimony on repressed and recovered memories for de-

Task Force. *See* Allen Frances, *Diagnosing the D.S.M.,* N.Y. Times, May 12, 2012, at A19. Illustrative of the "vigorous debate" that concerned the United States Supreme Court is the more recent warning of Dr. Frances that the psychological "Bible" has become a dangerous tool with a serious lack of oversight. *Id.* Moreover, Dr. Frances cautions that the DSM has been poorly used "in areas well beyond its competence," noting that, "[i]t is widely used (and misused) in the courts." *Id.*

termination of admissibility under the "helpfulness" standard of Minn. R. Evid. 702. *Id.* at 208 (citing *MacLennan*, 702 N.W.2d at 233 (concluding that courts should use Minn. R. Evid. 702 when determining whether syndrome evidence would be helpful to the jury)); *see State v. Obeta*, 796 N.W.2d 282, 293–94 (Minn. 2011); *State v. Hennum*, 441 N.W.2d 793, 797–99 (Minn.1989) (concluding that expert testimony on battered-woman syndrome would be helpful to the jury under a Minn. R. Evid. 702 analysis). The court, however, did not address either what standard of foundational reliability would be required for the admission of the expert testimony, or the district court's conclusion that evidence on the theory of repressed and recovered memory is not foundationally reliable. *See* Minn. R. Evid. 702 ("The opinion must have foundational reliability."); *see also* Minn. R. Evid. 703 comm. cmt.—1989 (stating that the facts underlying an expert's opinion are foundationally reliable if the answer to the following two questions is "yes": "1. are these facts and data of a type relied upon by experts in this field when forming inferences or opinions on the subject; [and] 2. is this reliance reasonable?"). If admissible as "syndrome" evidence, the court stated that "the experts' testimony should be limited to a description of memory repression and the characteristics that are present in an individual suffering from repressed memory," and that the experts "may not testify to the 'ultimate fact' of whether [Doe] suffered from repressed memory." *Doe*, 801 N.W.2d at 209.

Because the court of appeals ruled that Doe's expert testimony might be admissible under Minn. R. Evid. 702, and if admissible would create a genuine issue of material fact as to whether Doe had a disability that tolled the applicable statutes of limitations, it reversed the district court's summary judgment order as to Doe's negligence and fraud claims. *Id.*

## III.

■ The district court granted the Dioceses summary judgment and dismissed each of Doe's claims. On an appeal from summary judgment, we review a district court's application of the law and its determination that there are no genuine issues of material fact de novo, *STAR Ctrs., Inc. v. Faegre & Benson, L.L.P.*, 644 N.W.2d 72, 76–77 (Minn.2002), and examine the evidence in the light most favorable to the party against whom judgment was granted. *Fabio v. Bellomo*, 504 N.W.2d 758, 761 (Minn.1993). When considering a grant of summary judgment, we need not adopt the reasoning of the district court. *See Winkler v. Magnuson*, 539 N.W.2d 821, 827 (Minn.App.1995). Indeed, we may affirm a grant of summary judgment if it can be sustained on any grounds. *Cambern v. Hubbling*, 307 Minn. 168, 171, 238 N.W.2d 622, 624 (1976) (stating the general rule that if a district court's "rule is correct, it is not reversed solely because its stated reason was not correct"); *Winkler*, 539 N.W.2d at 827. We will reverse a grant of summary judgment when the district court erred in concluding that there are no disputed material facts. *See Sampair v. Village of Birchwood*, 784 N.W.2d 65, 76 (Minn.2010) (reversing summary judgment against appellants whose affidavits created genuine issues of material fact). But in order to establish that there is a disputed material fact, the party against whom summary judgment was granted must "present specific admissible facts showing a material fact issue." *O'Neil v. Kelly*, 307 Minn. 498, 499, 239 N.W.2d 231, 232 (1976).

■ Because the district court ordered summary judgment on timeliness grounds,

the only issue of material fact for us to consider is whether Doe's claims are timely. The district court found that Doe's claims were untimely after it excluded Doe's expert testimony on the theory of repressed and recovered memory, because without expert testimony tending to prove that Doe suffered from repressed memories, there was no question that Doe's claims are time-barred. We review a district court's evidentiary rulings, including rulings on foundational reliability, for an abuse of discretion. *State v. Loving*, 775 N.W.2d 872, 877 (Minn.2009) (citation omitted) (stating that we review a district court's determinations under the foundational reliability prong of *Frye–Mack* for an abuse of discretion); *Jacobson v. $55,900 in U.S. Currency*, 728 N.W.2d 510, 529 (Minn.2007) (citations omitted) (stating that a district court's determination of the adequacy of foundation offered for expert witness testimony under Minn. R. Evid. 702 will not be reversed absent abuse of discretion).

## IV.

The ultimate issue in this appeal is whether the district court properly granted the Dioceses summary judgment. But our resolution of that issue hinges on whether the court correctly excluded Doe's expert testimony on the theory of repressed and recovered memory offered to prove that Doe had a disability delaying the accrual of his causes of action. Therefore, we first consider the district court's evidentiary ruling.

### A.

Like all testimony, expert testimony must satisfy the basic requirements of the rules of evidence. Expert testimony is inadmissible if it is irrelevant. Minn. R. Evid. 402; *MacLennan,* 702 N.W.2d at 230. Evidence is irrelevant if it lacks "any

tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Minn. R. Evid. 401; *State v. Hurd,* 763 N.W.2d 17, 30 (Minn.2009). Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Minn. R. Evid. 403; *State v. Anderson,* 789 N.W.2d 227, 235 (Minn.2010). In addition to these basic requirements, expert testimony is inadmissible unless it satisfies the requirements of Minn. R. Evid. 702. Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. *The opinion must have foundational reliability.* In addition, if the opinion or evidence involves novel scientific theory, the proponent must establish that the underlying scientific evidence is generally accepted in the relevant scientific community.

Minn. R. Evid. 702 (emphasis added). In *Obeta*, we stated that expert testimony is only admissible under Minn. R. Evid. 702 if the proponent shows that the testimony passes a four-part test: (1) The witness must qualify as an expert; (2) the expert's opinion must have foundational reliability; (3) the expert testimony must be helpful to the trier of fact; and (4) if the testimony involves a novel scientific theory, it must satisfy the *Frye–Mack* standard. 796 N.W.2d at 289.

All expert testimony must satisfy the first three parts of the Rule 702 test. It is only when the proponent offers "novel" "scientific" evidence that the fourth

part of the test, the *Frye–Mack* standard, applies. When the *Frye–Mack* standard applies, it requires the proponent of novel scientific evidence to show that the evidence meets two additional requirements. *MacLennan,* 702 N.W.2d at 230 (citing *Goeb,* 615 N.W.2d at 814). First, the proponent of novel scientific evidence must prove that the science "is generally accepted in the relevant scientific community." *Goeb,* 615 N.W.2d at 814. Second, "the particular scientific evidence in each case must be shown to have foundational reliability." *Id.* Under the *Frye–Mack* standard, foundational reliability "requires the proponent of a ... test [to] establish that the test itself is reliable and that its administration in the particular instance conformed to the procedure necessary to ensure reliability." *Id.* (citation omitted) (internal quotation marks omitted).

The court of appeals reversed the district court's evidentiary ruling because it concluded that Rule 702, not the *Frye–Mack* standard, governed the admissibility of expert testimony on the theory of repressed and recovered memory. But the *Frye–Mack* standard *is* the fourth part of the four-part test set out in rule 702. Therefore, if we conclude that the district court properly excluded Doe's evidence under one of the first three parts of the test, we need not consider whether the theory of repressed and recovered memory is subject to the *Frye–Mack* standard.

### B.

Prior to 2006, Rule 702 provided: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Minn. R. Evid. 702 (2006) (amended July 18, 2006). Before 2006, therefore, Rule 702 required a proponent of expert testimony to show that (1) the witness qualifies as an expert and (2) the expert's opinion will aid the trier of fact in determining a fact at issue. *Id.* When interpreting this older version of the rule, we often stated that "the basic requirement of Rule 702 is the helpfulness requirement." *MacLennan,* 702 N.W.2d at 233 (quoting *State v. Helterbridle,* 301 N.W.2d 545, 547 (Minn. 1980)); *see also, e.g., State v. Saldana,* 324 N.W.2d 227, 229 (1982). The pre–2006 rule did not specifically require courts to consider whether the expert's opinion had foundational reliability. *See* Minn. R. Evid. 702 (2006).

The 2006 amendment to Rule 702 added these two sentences: "The [expert's] opinion must have foundational reliability. In addition, if the opinion or evidence involves novel scientific theory, the proponent must establish that the underlying scientific evidence is generally accepted in the relevant scientific community." Minn. R. Evid. 702 (2012). Under Rule 702's current four-part test, courts may be required to consider foundational reliability in two contexts. First, all experts' "opinion[s] must have foundational reliability" before they can be admitted. Minn. R. Evid. 702. Second, if the *Frye–Mack* standard applies, "the particular scientific evidence in each case must be shown to have foundational reliability[, which] requires the proponent of a ... test [to] establish that the test itself is reliable and that its administration in the particular instance conformed to the procedure necessary to ensure reliability." *Goeb,* 615 N.W.2d at 814 (citations omitted) (internal quotation marks omitted). Rule 702 does not define, generally, what "foundational reliability" means. Indeed, the comments to the 2006 amendments specifically decline to do so: "The ... amendment does not purport to

describe what that foundation must look like for all types of expert testimony. The required foundation will vary depending on the context of the opinion, but must lead to an opinion that will assist the trier of fact." Minn. R. Evid. 702 *advisory comm. cmt.— 2006 amendments*. But, at a minimum, foundational reliability must require that the theory forming the basis for the expert's opinion or test is reliable.

Here, the district court found that expert testimony on the theory of repressed and recovered memory was inadmissible as foundationally unreliable under the second prong of the *Frye–Mack* standard. The court stated that the foundational reliability prong of *Frye–Mack* required Doe to "show that the theory [of repressed and recovered memory] is reliable and trustworthy, based upon well-recognized scientific principles and independent validation, and that its administration in the particular instance conformed to the procedure necessary to ensure reliability." *Doe v. Archdiocese of Saint Paul & Minneapolis*, 62–C9–06–003962, Order at 26 (Ramsey Cty. Dist. Ct. Dec. 8, 2009) (citing *Sentinel Mgmt. Co. v. Aetna Cas. & Sur. Co.*, 615 N.W.2d 819, 824 (Minn.2000)). Applying this standard, the court found that, while Doe's experts claimed that 328 peer-reviewed scientific research articles con-firmed the existence and scientific reliability of repressed memory, the studies were unreliable. Specifically, the court stated "that the studies [did] not provide sufficient information about the scope of the subject's purported amnesia and that the accuracy of the recovered memories has not been scientifically established." *Id.* In making this finding, the court was supported by Doe's own expert, Dr. Chu, who conceded, "it was really impossible to know for sure whether or not [participants in repressed and recovered memory studies] actually remembered those events." Because the district court concluded that Doe's experts' opinions were based on studies with overwhelming methodological flaws, it found that evidence on the theory of repressed and recovered memory was not foundationally reliable.

Doe argues that the district court erred in applying the *Frye–Mack* foundational reliability standard, and instead should have subjected Doe's expert testimony to only the first three parts of Rule 702. According to Doe, the *Frye–Mack* foundational reliability standard only applies when considering whether a specific novel scientific test is reliable, and here, Doe's evidence is neither novel, scientific, or related to a test.[6] Relying on cases prior to

---

**6.** To the extent that *MacLennan* and *Hennum* suggest that expert testimony on the theory of repressed and recovered memory is "syndrome" evidence and "syndrome" evidence is admissible under Rule 702 without regard to foundational reliability, those cases are procedurally and substantively distinguishable. First, both *MacLennan* and *Hennum* were decided before the amendment to Rule 702 specifically added a foundational reliability requirement. *See MacLennan*, 702 N.W.2d 219 (2005 decision); *Hennum*, 441 N.W.2d 793 (1989 decision). Second, in both of those cases, the opponent of the syndrome evidence did not argue that the underlying syndrome was not foundationally reliable. Third, the evidence in those cases was introduced for a vastly different purpose. In both cases, the proponent offered general expert testimony on the characteristics of a syndrome to bolster the proponent's credibility. Specifically, the proponents offered the testimony in order to show that conscious behavior that could have seemed odd to the jury was consistent with normal behavior for someone suffering from the syndrome. *MacLennan*, 702 N.W.2d at 226–28, 233–34; *Hennum*, 441 N.W.2d at 798. Here, Doe is offering the expert testimony to prove that an unconscious psychological process prevented him from knowing that he was sexually abused, thus delaying the accrual of his causes of actions. Simply put, evidence relating to conscious behavioral decisions offered to bolster credibility is different from evidence related to unconscious psycho-

the 2006 amendment, Doe contends that Rule 702 is a helpfulness test, and that the reliability requirement requires only that the theory on which the expert will testify has gone "beyond the experimental stage and has gained a substantial enough scientific acceptance to warrant admissibility." *Hennum*, 441 N.W.2d at 798–99. Doe contends that his expert testimony may be admissible under this formulation of Rule 702, and therefore, the district court clearly erred in excluding his expert testimony under Rule 702.

## C.

 Doe is correct that, prior to amendment in 2006, we often discussed the evidentiary standard of Rule 702 as one of "helpfulness." But we have not considered the phrase, "[t]he opinion must have foundational reliability," in the amended version of Rule 702. We have also not decided whether a finding that the data supporting a theory is inherently unreliable under the *Frye–Mack* standard would be determinative of a foundational reliability finding under Rule 702. If such a finding is determinative, then Doe's expert testimony was properly excluded, absent an abuse of discretion, and it is irrelevant whether the district court nominally applied the *Frye–Mack* standard.

*Jacobson v. $55,900 in U.S. Currency* is our only decision on the subject of foundational reliability under the current version of Rule 702. *See* 728 N.W.2d 510, 529 (Minn.2007). *Jacobson* dealt with the forfeiture of money in connection with drug trafficking. In *Jacobson*, we analyzed whether "dog sniff evidence" was admissible to prove a connection between seized cash and drug trafficking. *Id.* at 518.

Specifically, we considered whether "dog sniff evidence" was foundationally reliable under Minn. R. Evid. 702. *Id.* at 528. ("[T]he party seeking to introduce the alert [of a drug sniffing dog] and related testimony must establish an adequate foundation").

When utilizing Rule 702, we held that district courts should evaluate the admission of expert testimony on a case-by-case basis, determining whether the expert's testimony will be helpful to the trier of fact and supported by adequate foundation. *Id.* at 529. In the context of "dog sniff evidence" offered to prove a connection between cash seized and drug trafficking in a forfeiture case, we concluded that adequate foundation would comprise "facts such as the certification(s) the dog has achieved, and the nature and extent of the training both the dog and the handler have completed." *Id.* (citations omitted). Next, we stated "[a] drug detection dog's accuracy rate is also critical to establishing an adequate foundation." *Id.* In describing the accuracy rate, we stated that both the number of instances where the dog accurately alerted to drugs and the number of instances where the dog failed to alert to the presence of drugs or alerted in the absence of drugs measured accuracy. *Id.* Finally, we insisted that the proponent of the "dog sniff evidence" must establish the steps taken to ensure a reliable test in the particular case. *Id.* Ultimately, we concluded that the "dog sniff evidence" in *Jacobson* was inadmissible as foundationally unreliable. *Id.* at 530–31.

 *Jacobson* illuminates the defining features of a Rule 702 foundational reliability analysis and takes it beyond a mere helpfulness standard. First, the dis-

---

logical processes offered to delay the accrual of a cause of action. What Doe did—waiting until well after his 24th birthday to bring his claims—is irrelevant. Why Doe waited is the

question that matters and *Hennum* and *MacLennan* are no help in answering that inquiry.

trict court must analyze the proffered testimony in light of the purpose for which it is being offered. *Id.* at 518, 529. Second, the court must consider the underlying reliability, consistency, and accuracy of the subject about which the expert is testifying. *Id.* at 529. Finally, we clearly stated that the proponent of evidence about a given subject must show that it is reliable in that particular case. *Id.* This analysis is nearly identical to the analysis done under the second prong of the *Frye–Mack* test. We have variously stated that foundational reliability under the *Frye–Mack* standard requires that "the particular scientific evidence in each case must be shown to have foundational reliability," *Goeb*, 615 N.W.2d at 814, "whether the laboratory conducting the tests in the individual case complied with appropriate standards and controls," *State v. Roman Nose*, 649 N.W.2d 815, 819 (Minn.2002), or simply as "whether the novel scientific evidence offered is shown to have foundational reliability." *MacLennan*, 702 N.W.2d at 230. While *Frye–Mack* deals with the reliability of a scientific test and Rule 702 deals with the reliability of an expert's opinion, the underlying foundational reliability analysis is substantially the same. Therefore, it makes little difference whether the district court called the analysis a "*Frye–Mack*" analysis or a "Rule 702" analysis. As long as the district court considered the relevant foundational reliability factors, we will not reverse its evidentiary finding absent an abuse of discretion. *See State v. Glaze*, 452 N.W.2d 655, 660 (Minn.1990).

■ Here, Doe intended to offer general testimony about the theory of repressed and recovered memory for the purpose of proving a disability delaying the accrual of his causes of action. If admissible as "syndrome" evidence, Doe's "experts' testimony [would] be limited to a description of memory repression and the characteristics that are present in an individual suffering from repressed memory," and the experts could "not testify to the ultimate fact of whether [Doe] suffered from repressed memory." [7] *Doe*, 801 N.W.2d at 209 (citation omitted) (internal quotation marks omitted). For Doe's claims to be timely, then, he must still show that he actually suffered from the disability of repressed memories from at least the day before his 18th birthday until sometime within 6 years before he filed his claim, because "[m]erely not thinking about the abuse is not enough to delay the running of the statute of limitations."

7. These limitations are consistent with our case law on expert testimony relating to "syndrome" evidence. *See MacLennan*, 702 N.W.2d at 234 (limiting testimony on battered child syndrome to a general description of the syndrome and the characteristics exhibited by someone suffering from the syndrome); *Hennum*, 441 N.W.2d at 799 (limiting testimony on battered woman syndrome similarly). Apart from foundational reliability concerns, we note that Doe's proposed evidence may have insurmountable Rule 403 problems. *See* Minn. R. Evid. 403. Doe must prove not only that repressed and recovered memory theory exists and is foundationally reliable, but that he actually suffered from it for the entire period from before his 18th birthday until sometime within 6 years of the date he filed this action. *See* Minn.Stat. § 541.073, subd. 2(a) ("An action for damages based on personal injury caused by sexual abuse must be commenced within six years of the time the plaintiff knew or had reason to know that the injury was caused by the sexual abuse."). General testimony about the nature of memory repression offers little probative value about the question of whether Doe actually suffered from memory repression, such that he literally was unable to remember the alleged abuse, for that entire period. Given that the studies, at a minimum, are not particularly successful in distinguishing repressed memory from other types of forgetting that would not delay the accrual of a cause of action, expert testimony on repressed and recovered memory would have a serious tendency to confuse the jury and unfairly prejudice defendants.

*W.J.L. v. Bugge,* 573 N.W.2d 677, 682 (Minn.1998).

The district court's order cut to the heart of the foundational reliability question, analyzing the underlying reliability, consistency, and accuracy of the theory of repressed and recovered memory—much as we contemplated in *Jacobson,* 728 N.W.2d at 529. After hearing 3 days of expert testimony and reviewing hundreds of studies, the court, in a thorough and painstaking analysis, found that evidence on the theory of repressed and recovered memory lacked foundational reliability when offered to prove a disability delaying the accrual of a cause of action. In other words, the court concluded that, because of serious methodological flaws, the scientific literature relied upon by Doe's experts simply did not support an argument that "someone could have a terrible trauma and then be literally unable to remember it for a period of time." The studies did not successfully differentiate repressed memory from other types of memory loss that would not delay the accrual of a cause of action, which is a critical distinction. *See Bugge,* 573 N.W.2d at 682. Because only bona fide repressed memories could delay the accrual of a cause of action for injuries based on sexual abuse, Doe needed the studies relied upon by his experts to show a distinction between repressed memories and other types of forgetting. Because they do not, they could not reliably support an argument that someone repressed memories. Moreover, the district court found that "the accuracy of the recovered memories has not been scientifically established," and Doe's experts conceded that there was no way to tell whether a person was actually suffering from repressed memories in any given case.

Nominally, the district court conducted a *Frye–Mack* foundational reliability analysis, but its conclusions and findings on the theory of repressed and recovered memory were a *de facto* Rule 702 analysis. Rule 702 requires a district court to consider the purpose for which the expert testimony is being offered, the reliability of the underlying theory, and the reliability of the evidence in the particular case. The court clearly considered all of these aspects of Doe's proffered expert testimony. Therefore, we will review the district court's evidentiary ruling for an abuse of discretion. *Jacobson,* 728 N.W.2d at 529.

### D.

After conducting a 3–day hearing, consisting of the testimony of five experts, the district court concluded that the data and studies that purported to prove the existence of repressed and recovered memory lacked foundational reliability. In judging the overall reliability of the theory, the court found that while there are hundreds of studies on the theory of repressed and recovered memory, it was unconvinced that any of the studies had proved the existence of, much less the accuracy or reliability of, repressed and recovered memories.

In short, based on the testimony of the experts (detailed above), this finding is more than adequately supported by the record. Specifically, Dr. Chu testified that there is no method for actually establishing the accuracy of recovered memories without corroborating evidence and Dr. Pope testified that "there [is] no way to validate that [the people claiming memory repression] were literally unable to remember the event." Doe's expert, Dr. Dalenberg, also conflated "memory repression" with "forgetting." Moreover, Dr. Loftus testified that the significant postevent "suggestions" in this case made it more likely that Doe had suffered from memory distortion. Because there is ample evidence in the record supporting a

conclusion that the theory of repressed and recovered memory lacks foundational reliability when offered for the purpose of proving that Doe had a disability delaying the accrual of his causes of action, the district court did not abuse its discretion when it excluded Doe's expert testimony.[8]

We acknowledge that courts in other jurisdictions have reached different conclusions on this issue and recognize that some have admitted evidence on the theory of repressed and recovered memory under differing evidentiary standards when offered for a variety of reasons. *See Phillips v. Gelpke,* 190 N.J. 580, 921 A.2d 1067, 1068 (2007) (holding that in a timely action for damages resulting from sexual abuse, a plaintiff could testify about her claim of repressed and recovered memories without expert testimony on the theory because the case was one of "I *forgot* and then I remembered," and jury did not need an expert to help them understand that process) (emphasis added).[9] However, many

---

**8.** The dissent's suggestion that we have focused our analysis on the *Frye–Mack* standard is puzzling to say the least. As we have noted several times in our opinion, the real issue here is whether the evidence proffered by Doe was foundationally reliable. As we described in section IV.C., it is immaterial that the district court *nominally* conducted a *Frye–Mack* foundational reliability analysis because, in doing so, it conducted a *de facto* Rule 702 analysis. The district court concluded that the evidence was not foundationally reliable, and because we can find no abuse of discretion in that finding, we must reverse the court of appeals. While in some cases it may be crucial to decide whether or not the district court properly undertook a *Frye–Mack* analysis (for example, a case where the district court excluded evidence *solely* on general acceptance grounds), this is not that case.

The district court has already determined that Doe's evidence is foundationally unreliable. As such, Doe's evidence·is inadmissible under Rule 702, and a remand for a Rule 702 analysis would serve no purpose.

**9.** Most recently, the Supreme Court of Massachusetts held that expert testimony on the theory of memory repression was admissible under a standard somewhat similar to our *Frye–Mack* standard. *Commonwealth v. Shanley,* 455 Mass. 752, 919 N.E.2d 1254, 1263 (2010) (citing *Commonwealth v. Lanigan,* 419 Mass. 15, 641 N.E.2d 1342 (1994) for its evidentiary standard).

*Shanley* is distinguishable on substantive and procedural grounds. First, the criminal action in *Shanley* was clearly timely and therefore it was immaterial whether the complainant had repressed his memories or simply recalled them after a period of ordinary forgetting. As such, the court had no need to, and did not, differentiate between ordinary forgetting and repressed memory because in a timely action the distinction is irrelevant. *See Shanley* at 1272 n. 31 (stating that a jury instruction on the necessity that the complainant repressed his memories was unnecessary because *"memories of childhood sexual abuse may be forgotten and remembered without being repressed"*) (emphasis added). Here, however, the difference between "forgetting" and "repression" is of utmost importance because only a mental disability that shows Doe had no reason to know of his cause of action due to repressed memories could delay the accrual of Doe's claims. *See Bugge,* 573 N.W.2d at 682. Therefore, *Shanley* simply does not address the question we face here. Second, the *Shanley* court did not even discuss whether evidence on the theory of repressed and recovered memory has foundational reliability when offered to prove a disability delaying the accrual of a cause of action. Third, *Shanley* reached the Massachusetts Supreme Court in a procedural posture different from that in which *Doe* reached us. Like in Minnesota, appellate courts in Massachusetts review evidentiary findings for an abuse of discretion. *See Shanley,* 919 N.E.2d at 1266. In *Shanley,* the trial court, contrary to the district court in this case, ruled that the evidence was admissible. While noting that there are significant doubts about the validity of the theory, the Massachusetts Supreme Court concluded that the trial court had not abused its discretion in admitting the evidence. *Id.* Because the *Shanley* court applied the same standard of review to an opposite district court evidentiary finding on admissibility of the expert testimony, offered for a different purpose, its decision is of little value here.

jurisdictions have, for a variety of reasons, ruled that evidence of repressed memories is insufficient to toll statutes of limitations. *Travis v. Ziter*, 681 So.2d 1348 (Ala.1996); *Barre v. Hoffman*, 326 S.W.3d 415 (Ark. 2009) (holding that memory repression was not a disability tolling a statute of limitations); *Nuccio v. Nuccio*, 673 A.2d 1331 (Me.1996); *Doe v. Maskell*, 342 Md. 684, 679 A.2d 1087, 1092 (1996) ("After reviewing the arguments on both sides of the issue, we are unconvinced that repression exists as a phenomenon separate and apart from the normal process of forgetting. Because we find these two processes to be indistinguishable scientifically, it follows that they should be treated the same legally."); *Lemmerman v. Fealk*, 449 Mich. 56, 534 N.W.2d 695 (1995) (holding that memory repression cannot toll the statute of limitations and that the opposite holding would eviscerate the statute of limitations); *State v. Hungerford*, 142 N.H. 110, 697 A.2d 916 (1997); *Pratte v. Stewart*, 125 Ohio St.3d 473, 929 N.E.2d 415 (2010) (discussing that its case law allowing memory repression to toll the statute of limitations was abrogated by statute); *Lovelace v. Keohane*, 831 P.2d 624 (Okla.1992); *Dalrymple v. Brown*, 549 Pa. 217, 701 A.2d 164 (1997); *Doe v. Archdiocese of Milwaukee*, 211 Wis.2d 312, 565 N.W.2d 94 (1997) (holding that, as a matter of public policy, the unreliability of repressed memory theory prevented it from tolling the statute of limitations); *see also Smith v. Smith*, 830 F.2d 11 (2d Cir.1987).

### V.

Having determined that the district court properly excluded Doe's expert testimony on the theory of repressed and re-

covered memory, we now consider whether the district court erred in granting the Dioceses summary judgment. We note again that, because the district court granted the Dioceses summary judgment and dismissed Doe's claims on statutes of limitations grounds, the timeliness of Doe's claims is the only question of material fact we need consider.

### A.

Doe brought his negligence claims under the so called "delayed discovery statute." Under the delayed discovery statute, the statute of limitations for claims based on injuries from sexual abuse begins to run once a reasonable person would know that he is injured. *D.M.S. v. Barber*, 645 N.W.2d 383, 389 (Minn.2002). As a matter of law, one is injured if one is sexually abused. *Blackowiak v. Kemp*, 546 N.W.2d 1, 3 (Minn.1996). But, as a matter of law, "a reasonable person under the legal disability of infancy is incapable of recognizing or understanding that he or she has been sexually abused," and therefore the 6–year statute of limitations in the delayed discovery statute does not begin to run until the person reaches the age of 18. *Barber*, 645 N.W.2d at 389.

Doe claims that Fr. Adamson sexually abused him in 1980 or 1981. Because Doe was a minor at that time, the delayed discovery statute did not begin to run until Doe's 18th birthday on June 11, 1985. *See Barber*, 645 N.W.2d at 389. Without expert testimony tending to prove that Doe actually suffered from repressed memories from sometime before June 11, 1985, until sometime after April 24, 2000, he cannot show that his claims are timely.[10] *Cf. Har-*

**10.** We acknowledge that, in enacting Minn. Stat. § 541.073, the Legislature relied on discussions about the theory of repressed and recovered memories. *See Bugge*, 573 N.W.2d at 680 n. 5. But the delayed discovery statute itself neither expressly adopts nor validates the theory of repressed and recovered memory. Instead, by creating a 6–year statute of limitations from "the time the plaintiff knew or had reason to know that the injury was

*rington v. Ramsey Cty.*, 279 N.W.2d 791, 796 (Minn.1979) (holding that a "[p]laintiff's mere assertion of insanity to toll the statute of limitations does not create a factual dispute to be resolved by the jury."). Because Doe cannot show that his negligence claims accrued after April 24, 2000, Doe's claims expired after his 24th birthday on June 11, 1991. Therefore, the district court did not err in concluding that Doe's claims were untimely.

### B.

 Doe claims that his fraud claims are subject to the 6–year fraud statute of limitations, not the statute of limitations in the delayed discovery statute.[11] The 6–year fraud statute of limitations begins to run when the aggrieved party discovers the facts constituting the fraud. Minn.Stat. § 541.05, subd. 1(6). We judge discovery of the fraud under the reasonable person standard. *Bustad v. Bustad*, 263 Minn. 238, 242, 116 N.W.2d 552, 555 (1962). The facts constituting the

fraud are deemed to have been discovered when they were actually discovered or, "by reasonable diligence, should have been discovered." *Toombs v. Daniels*, 361 N.W.2d 801, 809 (Minn.1985).

Without expert testimony that he suffered from repressed memories, Doe's only evidence that his fraud claims are timely is Doe's bare assertion that he did not subjectively know that the Dioceses defrauded him until 2001 or 2002. Doe claims that he "did not discover that the [Dioceses] knowingly placed a child molester at Risen Savior and allowed that child molester to access kids, including himself, until sometime after he had a memory that he was sexually abused in 2001 or 2002."

Doe's subjective claim that he did not actually know the facts constituting the fraud is not relevant because the standard is an objective one. There is no dispute in the record that as an objective matter, Doe should have known those facts in the 1980s

caused by the sexual abuse," the statute creates a possible avenue for delaying the accrual of a cause of action if the theory can be validated or developed to the point where evidence relating to it would be reliable enough to be admissible. Statutes of limitation are creatures of legislative action; the Legislature could abolish statutes of limitation as applied to specific types of actions or could choose to specifically recognize repressed and recovered memories as an exception to a limitation on actions. Here, the Legislature did neither, and only enacted a general "knew or had reason to know" limitation. *Id.* at 680.

Moreover, the "limitations period found in section 541.073 was not intended to be open-ended," *id.*, and we judge when a plaintiff "knew or should have known" he had injuries caused by sexual abuse under an objective standard. *Barber*, 645 N.W.2d at 387. As the expert testimony at the *Frye–Mack* hearing made clear, there is essentially no defense to a claim of repressed memory because the plaintiff claiming repressed memory cannot be effectively cross-examined about his honestly held belief that the memory was repressed. Doe's own experts conceded that

there is no way to determine whether the supposedly repressed memories are accurate, absent independent corroboration. And the Dioceses' experts testified that there is little, if any, evidence suggesting that memory repression is a process different from other memory processes that cannot toll a statute of limitations. When we consider all of these factors, under current scientific understanding of the theory, allowing repressed memories to delay the accrual of a cause of action eviscerates an objective statute of limitations and allows any plaintiff to bring stale abuse claims simply by uttering the words "I repressed my memory."

**11.** The Dioceses contend that the delayed discovery statute of limitations applies to all of Doe's claims because all of Doe's claims are predicated on injuries caused by sexual abuse. Because we conclude that Doe's claims would be untimely under either statute of limitations, we assume, without deciding, that the fraud statute of limitations in Minn.Stat. § 541.05, subd. 1(6), governs Doe's fraud claims.

or 1990s. First, in 2009 Doe told Fr. Thomas Doyle that, *at the time of the alleged abuse,* Doe felt emotionally paralyzed, shocked, and isolated and that he was afraid to tell anyone about the abuse. Doe also "was aware that Fr. Adamson had sexually abused other boys in the 1980's." Clearly, if Doe knew that Fr. Adamson had abused Doe and other children in the 1980s, he actually knew that Fr. Adamson was a danger to children.

There is also no dispute that Doe should have known that the Dioceses concealed Fr. Adamson's history of abuse well before he filed his claims. Briefly, there were over 130 local newspaper articles written about Fr. Adamson's history of abuse in the late 1980s and early 1990s. Doe's mother asked Doe in 1986 if Fr. Adamson had ever abused Doe, to which Doe responded in the negative. And Doe testified that, in the 1990s, he was aware of the problem of sexual abuse in the Catholic Church. Because the evidence establishes that Doe should have known about the facts constituting his fraud claim by at least the early 1990s, there is no genuine issue of material fact as to whether Doe's fraud claims are timely. Therefore, the district court did not err in concluding that Doe's fraud claims were untimely.

Because Doe's claims are time-barred, we hold that the district court did not err in granting the Dioceses summary judgment on, and dismissing, all of Doe's claims.

Reversed.

STRAS, J., took no part in the consideration or decision of this case.

ANDERSON, PAUL H., Justice, dissenting.

I respectfully dissent. Unlike the majority, I would affirm the court of appeals' holding that the district court erred when it (1) used our *Frye–Mack* standard to exclude plaintiff's expert testimony on repressed-memory theory, and (2) granted summary judgment in favor of the defendant religious organizations. I would hold that in this action based on alleged child sexual abuse, the admissibility of expert testimony regarding repressed-memory theory must be determined under the relevant provisions of Rule 702 of the Minnesota Rules of Evidence.

I reach the conclusion that *Frye–Mack* is not the proper standard here because we have said that the *Frye–Mack* standard does not apply to all questions involving scientific evidence. *See State v. MacLennan,* 702 N.W.2d 219, 230–31 (Minn.2005). More specifically, we have said that our *Frye–Mack* standard only applies to evidence based on "emerging scientific techniques." *Jacobson v. $55,900 in U.S. Currency,* 728 N.W.2d 510, 528 (Minn.2007) (stating that "the technique of using trained dogs to detect drug odors is neither emerging nor scientific"). Unlike the majority, I conclude that the expert testimony that John Doe seeks to have admitted here does not fit comfortably within the parameters of the type of evidence we have held is governed by our *Frye–Mack* standard, i.e., expert evidence based on emerging scientific techniques.

Rather, I conclude that the admissibility analysis of John Doe's proffered expert testimony on repressed memory theory fits much more naturally within the ambit of Rule 702. Under a Rule 702 analysis, expert testimony is admissible if it will assist the trier of fact to understand the evidence or determine facts at issue and has foundational reliability. John Doe asserts that his proffered expert testimony meets both the foundational reliability and helpfulness mandates of Rule 702. I agree with the underlying premise of Doe's assertion. Doe has made a sufficient show-

ing such that he is entitled to have the district court make a determination whether his proffered testimony meets the foregoing relevant provisions of Rule 702. Further, I conclude that because there may be a genuine issue of material fact as to when John Doe became aware of his memory that Father Thomas Adamson may have sexually abused him, the district court erred when it used the statute of limitations as the grounds upon which to grant summary judgment in favor of the defendant religious organizations.

On April 24, 2006, plaintiff John Doe commenced this action for negligence and fraud against the defendant religious organizations—the Archdiocese of Saint Paul & Minneapolis and the Diocese of Winona. In his action, John Doe alleges that the defendant religious organizations were negligent in allowing Father Thomas Adamson, a priest whom they supervised and controlled, to sexually molest him. Doe also alleges that the defendant religious organizations fraudulently concealed and intentionally failed to disclose that Father Adamson was a child molester.

The story that provides the backdrop to John Doe's action overflows with tragedy, sorrow, and pathos. It also presents a profoundly sad tale about how the leadership of the defendant religious organizations failed to fulfill their responsibility to act in an appropriate manner to adequately protect vulnerable young children and adolescents entrusted to their care. Those in leadership positions within the defendant religious organizations failed to act in a manner that would provide sufficient protection of the health, welfare, and safety of these children and adolescents.

More specifically, the record before us demonstrates that it is beyond dispute that Father Adamson had a long history of sexually molesting children. It is well established that between the early 1960s and the 1990s, Father Adamson molested several children who were members of parishes where he served as a priest. It is also beyond dispute that the defendant religious organizations knew that Father Adamson molested children entrusted to their care. The record shows that the defendant religious organizations received reports that Father Adamson was molesting children; and, in fact, Father Adamson admitted to certain persons in leadership positions within the defendant religious organizations that he had been a party to several separate indecent incidents with young boys who were members of his parishes.

While the defendant religious organizations did in 1974 and 1981 refer Father Adamson to medical facilities for treatment of his condition, it is also beyond dispute that they did not make Father Adamson's history of sexually molesting children public before the mid–1980s. More problematic is the defendant religious organizations' response to the situation once they knew that Father Adamson was molesting children entrusted to their care. The defendant religious organizations' long-term and recurring response was to transfer Father Adamson to a different parish.

John Doe belonged to one of those different parishes to which Father Adamson was reassigned after the defendant religious organizations received reports that Father Adamson was sexually molesting children in the parish to which he was assigned. More specifically, in February 1981, after approximately 1 month of treatment at a hospital, Father Adamson was assigned to John Doe's parish—Church of the Risen Savior in Burnsville, Minnesota. It was during the time period when Father Adamson was assigned to Risen Savior parish that the acts of child abuse involving John Doe allegedly occurred.

While the facts in the story that provides the backdrop to John Doe's action are generally beyond dispute, what is in dispute is whether Father Adamson sexually molested John Doe while serving as Doe's parish priest at Risen Savior. Doe alleges that Father Adamson sexually molested him on four occasions in 1980 or 1981. Doe claims that at some unspecified time after those incidents he repressed his memories of the alleged sexual abuse. Doe asserts that it was not until the summer of 2002 that he recovered some memory of these incidents and sought therapy from mental health professionals. He alleges that this therapy enabled him to more fully recover the memories of sexual abuse by Father Adamson that he had previously repressed. Doe commenced this action only after he allegedly recovered his memory of these alleged acts of sexual abuse.

The timing of the alleged recovery of Doe's memory is very important here because the parties agree that the statute of limitations applicable to Doe's negligence-based claims is Minn.Stat. § 541.073 (2010). Section 541.073 provides that an action for damages based on personal injury caused by sexual abuse or negligently permitting sexual abuse "must be commenced within six years of the time the plaintiff knew of or had reason to know that the injury was caused by the sexual abuse." We have said that because the "concepts of sexual abuse and injury within the meaning of this statute are essentially one and the same, not separable—as a matter of law one is 'injured' if one is sexually abused." *Blackowiak v. Kemp*, 546 N.W.2d 1, 3 (Minn.1996).

The "ultimate question" we must answer when determining whether the statute of limitations prohibits Doe's action is quite simple when stated in the abstract—we must determine "the time at which" John Doe knew or should have known that he was sexually abused. *Id.* While the question can be stated simply, the answer is often difficult to ascertain and the route to be taken when seeking the answer is often open to dispute. But, our court has already provided some benchmarks for making this determination. We have said that our determination is subject to "the objective, reasonable person standard." *Id.* We have also said that the limitations period for tort claims "begins to run once a victim is abused unless there is some legal disability, such as the victim's age, or mental disability, *such as repressed memory of the abuse,* which would make a reasonable person incapable of recognizing or understanding that he or she had been sexually abused." *W.J.L. v. Bugge*, 573 N.W.2d 677, 681 (Minn.1998) (emphasis added).

In addition, the Legislature has provided some of its own benchmarks for determining when the statute of limitations begins to run in a sexual abuse case. One such benchmark is provided by the legislative history of Minn.Stat. § 541.073. In drafting section 541.073—also known as the "delayed discovery statute"—the Legislature "acknowledged that repressed memory ... may prevent sexual abuse victims from coming forward with actions against their alleged abusers in a timely fashion." *Bugge*, 573 N.W.2d at 680 n. 5 (citing Hearing on S.F. 315, S. Judiciary Comm., Criminal Law Div., 76th Minn. Leg., Feb. 17, 1989 (audio tape)). The Legislature "sought to address this phenomenon by giving sexual abuse victims additional time to recognize the abuse they suffered while placing a limit on when such claims may be brought." *Id.* at 680.

At the district court level during the pretrial in this case, John Doe proffered expert testimony in support of his repressed-memory theory. The defendant religious organizations asked the court to

conduct a *Frye–Mack* hearing to determine the admissibility of Doe's proffered testimony. The defendant religious organizations claim that Doe did not object to the court's use of the *Frye–Mack* standard and appear to argue on appeal that because there was no objection our analysis on appeal must focus on whether Doe's proffered testimony is admissible under *Frye–Mack*. But the record reflects that Doe did object to the court's use of the *Frye–Mack* standard.[1] Because Doe made an objection before the district court, I conclude that Doe has properly preserved for appeal the issue of which standard is the proper standard for the court to apply—*Frye–Mack* or Rule 702. Thus, for purposes of this appeal, the issue before us concerns which of the two evidentiary standards the court should apply when determining the admissibility of Doe's proffered expert testimony on repressed memory. When we conduct this type of analysis, Rule 702 emerges as the proper standard.

The admissibility of expert testimony is governed by Minn. R. Evid. 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. The opinion must have foundational reliability. In addition, if the opinion or evidence involves novel scientific theory, the proponent must establish that the underlying scientific evidence is generally accepted in the relevant scientific community.

Expert testimony is admissible under Rule 702 if: (1) the witness is qualified as an expert, (2) the expert's opinion has foundational reliability; (3) the expert testimony is helpful to the jury; and (4) if the testimony involves a novel scientific theory, it must satisfy the *Frye–Mack* standard. *State v. Obeta*, 796 N.W.2d 282, 289 (Minn. 2011).

At issue is whether the *Frye–Mack* standard applies to Doe's proffered expert testimony about repressed memory in cases involving child sexual abuse victims. *See Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923); *State v. Mack*, 292 N.W.2d 764, 768 (Minn.1980). The *Frye–Mack* test has two prongs:

> Under the first prong, the court asks whether experts in the field widely share the view that the results of scientific testing are scientifically reliable. Under the second prong of the *Frye–Mack* test, the court considers whether the laboratory conducting the tests in the individual case complied with appropriate standards and controls. . . .

*State v. Hull*, 788 N.W.2d 91, 103 (Minn. 2010) (footnote omitted) (citations omitted) (internal quotation marks omitted); *see also Goeb v. Tharaldson*, 615 N.W.2d 800, 815 (Minn.2000) (stating that questions of "general acceptance in the relevant scientific field" are questions of law, but questions of foundational reliability are reviewed under the abuse of discretion standard).

As previously noted, we have said the *Frye–Mack* standard does not apply to all questions involving the admissibility of scientific evidence. *See MacLennan*, 702 N.W.2d at 230–31. Application of the standard is limited to evidence based on

---

1. Despite his objection to the use of the *Frye–Mack* standard, Doe argues in the alternative on appeal that the two expert opinions he seeks to admit in support of his claims related to repressed memory meet the *Frye–Mack* standard. Perhaps because of this argument, the majority has chosen to focus its analysis on *Frye–Mack*.

"emerging scientific techniques." *See Jacobson,* 728 N.W.2d at 528. We have explained that the application of the *Frye–Mack* standard supports a distinction between different types of expert testimony. More specifically, we stated that "[t]he requirements of the *Frye–Mack* standard support" a "distinction between scientific evidence derived from a specific test or diagnosis and expert testimony that offers an explanation for a person's behavior." *MacLennan,* 702 N.W.2d at 232–33; *see also State v. Hennum,* 441 N.W.2d 793, 797–99 (Minn.1989) (declining to use *Frye–Mack* standard for expert testimony regarding battered woman syndrome).

In *MacLennan,* a case which addressed the admissibility of expert testimony on battered child syndrome, we engaged in an extensive discussion on the proper use of the *Frye–Mack* standard. Our discussion in *MacLennan* is relevant and helpful here because that discussion took place in the context of circumstances that were significantly similar to the circumstances presented by this case. 702 N.W.2d at 230–35. We noted in *MacLennan* that we had previously "applied *Frye–Mack* to evidence falling into the general field of psychology," but had not "applied *Frye–Mack* in cases addressing the admissibility of 'syndrome' evidence offered to explain behavior." *Id.* at 230. In *MacLennan* we cited the following cases in support of this statement:

> *State v. Borchardt*[,] 478 N.W.2d 757 (Minn.1991) (concluding that the trial court did not abuse its discretion in excluding expert testimony of "male sexual victimization"). *Compare Mack*[,] 292 N.W.2d at 768 (applying *Frye* to hypnotically-induced testimony), [*and* ] *State v. Anderson*[,] 379 N.W.2d 70, 79 (Minn. 1985) (applying *Frye* and excluding the results of a personality assessment), *with State v. Hennum*[,] 441 N.W.2d 793 (Minn.1989) (holding that expert testimony on battered woman syndrome is admissible); *State v. Hall*[,] 406 N.W.2d 503 (Minn.1987) (holding that the trial court did not abuse its discretion in admitting expert testimony concerning the behavioral characteristics typically displayed by adolescent victims of sexual assault); *State v. Myers*[,] 359 N.W.2d 604 (Minn.1984) (holding that expert testimony about the emotional and psychological characteristics often observed in children who are victims of sexual abuse was admissible); [*and* ] *State v. Saldana*[,] 324 N.W.2d 227 (Minn.1982) (holding that expert testimony on rape trauma syndrome was inadmissible).

702 N.W.2d at 230 n. 3. In our analysis, we drew a specific distinction between cases involving physical science and cases involving syndromes. We said:

> Unlike a case involving physical science such as .DNA testing, in the area of "syndromes" experts do not administer a specific set of tests to discern whether a defendant suffers from either battered woman syndrome or battered child syndrome. Further, such experts may not testify about whether a particular defendant actually suffers from a syndrome. Rather, experts on "syndromes"—including battered child syndrome—are only permitted to testify about the syndrome in a general manner, provided that the testimony is "helpful" to the jury.

*Id.* at 233 (citations omitted). In essence, in *MacLennan* we concluded that expert testimony on syndromes, unlike DNA and other physical science evidence, is not the type of evidence that the analytic framework established by *Frye–Mack* was designed to address. *Id.*

The court of appeals, in concluding that the district court erred when it applied the *Frye–Mack* standard to Doe's proffered

expert testing, stated that the "reasoning in *MacLennan* persuades us that *Frye–Mack* is not the appropriate analytical framework for evaluating the admissibility of the proffered expert testimony on the repressed-memory theory in this case." *Doe v. Archdiocese of St. Paul & Minneapolis,* 801 N.W.2d 203, 207 (Minn.App. 2011). The court of appeals went on to explain:

> Unlike DNA evidence, for example, in this case, no "technique [or] procedure[ ] based on chemical, biological, or other physical sciences" exists for evaluation by the scientific community. Instead, the community is left to disagree about a social or psychological theory of behavior that cannot be subjected to a definitive scientific test. No "method" of testing the condition of repressed memory exists for general acceptance or non-acceptance by the scientific community. Similarly, no "scientific techniques" or "fancy devices" exist for presentation in court that could "mislead lay jurors awed by an aura of mystic infallibility."

*Id.* at 207–08 (citations omitted).

I agree with the court of appeals' analysis. That court correctly understood what we were getting at in *MacLennan* and applied the proper standard. The court then remanded this case to the district court for a determination of the admissibility of Doe's proffered expert testimony under the relevant evidentiary standards articulated in Minn. R. Evid. 702. I would do the same.

I would remand this case to the district court and leave the question of the admissibility of Doe's expert testimony to that court's sound discretion. On remand the district court should evaluate whether Doe's proffered expert testimony would assist the jury to understand the distinction between repressed memory and the ordinary process of forgetting—a distinc-

tion that may well be beyond the normal understanding of a layperson. Further, the court should consider our already articulated explanation for the delayed discovery statute. We have said:

> The underlying rationale for the limitations period contained in Minn.Stat. § 541.073 is that many sexual abuse victims, especially young children, are psychologically and emotionally unable to recognize that they have been abused. As a result, these victims are often incapable of bringing their claims within the [ordinary] limitations period....

*Bugge,* 573 N.W.2d at 680. Here it is important to reflect upon the previously discussed benchmark established by the Legislature. As noted, the Legislature has "acknowledged that repressed memory, denial, shame, and other similar factors may prevent sexual abuse victims from coming forward with actions against their alleged abusers in a timely fashion." *Id.* at 680 n. 5. And as the court of appeals said in this case:

> The reaction of a child to sexual abuse, under the circumstances alleged in this case, may be outside the common understanding of an average juror. Armed with the additional understanding provided through expert testimony, the jury may be able to determine whether [Doe] suffered from repressed memory of his abuse, tolling the limitations period under Minn.Stat. § 541.073.

*Doe,* 801 N.W.2d at 209.

If upon remand the district court admits Doe's expert testimony, that does not mean his experts have free rein to render their opinions on all matters involving repressed memory that are specific to Doe's case. Any expert testimony should be limited to a description of memory repression and the characteristics that are present in an individual suffering from repressed memory. If allowed to testify, the experts

may not testify to the ultimate fact of whether Doe suffered from repressed memory. Further, the defendant religious organizations can attempt to rebut Doe's expert testimony through cross-examination and the presentation of their own expert testimony.

At this point, there is a need to address the defendant religious organizations' argument that any decision affirming the court of appeals will establish a new standard of proof that will have far reaching consequences and will open up the court to many different kinds of psychological evidence. The defendant religious organizations also argue that if we affirm, we will be ignoring overwhelming scientific evidence in the record that supports the district court's finding that the theory of repressed and recovered memory has not achieved general scientific acceptance and does not have foundational reliability—a finding they assert is supported by opinions from courts in other jurisdictions that

have increasingly expressed concern over the validity of recovered memories.[2]

I acknowledge that the arguments of the defendant religious organizations have some merit. Courts in other jurisdictions are divided on the issue of whether a *Frye* or *Daubert*[3] hearing is needed to assess the admissibility of repressed memory evidence, and courts are also divided on the ultimate admissibility of this type of evidence.[4] But, that is not the situation in Minnesota. We have endorsed a distinction between "scientific evidence derived from a specific test or diagnosis" and "expert testimony that offers an explanation for a person's behavior." *MacLennan,* 702 N.W.2d at 232–33. In *MacLennan* we decided that the *Frye–Mack* analytic framework is not suitable to expert testimony in the area of syndromes—specifically, battered child syndrome. But, we also acknowledged that we had applied the *Frye–Mack* test to psychological evidence. *Id.* at 230. That said, I cannot ignore the

**2.** *See Friedman v. Rehal,* 618 F.3d 142, 160 (2d Cir.2010) (discussing "consensus within the social science community that suggestive memory recovery tactics can create false memories"); *State v. Hungerford,* 142 N.H. 110, 697 A.2d 916, 923–24 (1997) (applying *Daubert* and concluding that "a case-by-case approach, tempered with skepticism, is most appropriate in this context"); *Franklin v. Stevenson,* 987 P.2d 22, 28 (Utah 1999) (concluding that testimony concerning therapeutic recovery techniques used in connection with revived memories was unreliable).

**3.** Like *Frye–Mack,* the terms *Frye* and *Daubert* refer to rules of evidence which are used in other jurisdictions on the admissibility of scientific evidence and again, like *Frye–Mack,* the terms take their respective names from the court cases that originally articulated the rule of evidence they represent. *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923).

**4.** *See, e.g., Shahzade v. Gregory,* 923 F.Supp. 286, 289–90 (D.Mass.1996) (applying *Daubert* and finding general acceptance and admitting

evidence); *Logerquist v. McVey,* 196 Ariz. 470, 1 P.3d 113, 133–34 (2000) (holding that *Frye* does not apply and admitting evidence); *Wilson v. Phillips,* 73 Cal.App.4th 250, 86 Cal. Rptr.2d 204, 208 (1999) (concluding that *Frye* does not apply and admitting evidence); *Doe v. Shults–Lewis Child & Family Servs., Inc.,* 718 N.E.2d 738, 750–51 & n. 6 (Ind.1999) (applying *Daubert* but refusing "to declare repressed memory syndrome unreliable"); *State v. Hungerford,* 142 N.H. 110, 697 A.2d 916, 929–30 (1997) (applying *Frye* and precluding evidence); *Moriarty v. Garden Sanctuary Church of God,* 334 S.C. 150, 511 S.E.2d 699, 710–11 (S.C.Ct.App.1999) (concluding that repressed memory syndrome is a valid theory under South Carolina standard for admission of scientific evidence), *aff'd,* 341 S.C. 320, 534 S.E.2d 672 (2000). Sometimes the result depends on how the memory was recovered—for example, whether the memory was recovered as a result of counseling or suggestive memory techniques. *See generally* 6 Clifford S. Fishman & Anne T. McKenna, *Jones on Evidence* § 41:20 (7th ed.1992).

fact that the Legislature has enacted the delayed discovery statute, which enactment indicates that the Legislature has already concluded that repressed memory and "other similar factors may prevent sexual abuse victims from coming forward ... in a timely fashion." *Bugge,* 573 N.W.2d at 680 n. 5. The Legislature's decision to codify the concept of repressed memory should be a clear indication that in Minnesota expert repressed memory testimony should not be viewed under the lens of the *Frye–Mack* "emerging scientific techniques" standard. Rather, given the position taken by the Legislature and the other reasons I have listed, the analysis to be undertaken when determining the admissibility of Doe's proffered expert testimony falls much more comfortably within the ambit of the foundational reliability and helpfulness provisions of Rule 702.[5]

For many of the same reasons I have articulated for reversing the district court's grant of summary judgment on Doe's negligence claim, I would also reverse the district court's grant of summary judgment on Doe's fraud claims. I conclude that once the court has sorted out the admissibility of Doe's expert testimony under the proper evidentiary standard, the court will be in a much better position to make a decision on whether Doe's fraud claims are timely under the relevant statute of limitations.

For all the foregoing reasons, I would affirm the court of appeals' decision reversing the district court and would remand to the district court so that it can properly evaluate and consider the admissibility of Doe's proffered expert testimony under the relevant provisions of Rule 702.

MEYER, Justice (dissenting).

I join in the dissent of Justice Paul H. Anderson.

---

**5.** The majority asserts that there is no need to remand to the district court for a foundational reliability determination under Rule 702 because the court engaged in a "de facto" Rule 702 analysis. I disagree with following this procedure. It is undisputed that the district court analyzed John Doe's proffered testimony under the *Frye–Mack* standard. As I have discussed in this dissent, *Frye–Mack* is the wrong standard. There is no guarantee, given the nuances in the *Frye–Mack* standard and Rule 702, that the court's result would be the same if the foundational reliability determination were made under Rule 702. John Doe is entitled to have his proffered expert testimony on repressed memory analyzed under the correct standard.