ANDERSON, Justice.
*224 Appellant Thaleaha McBee was employed at an aluminum die-casting plant operated by respondent Team Industries, Inc. McBee, who was experiencing back problems, brought suit against Team under the Minnesota Human Rights Act, Minn. Stat. §§ 363A.01 -.44 (2018), claiming that Team failed to engage in an interactive process to determine reasonable accommodations for her disability before Team ended her employment. Team argues that no interactive process is required under the Act; regardless, McBee could not perform the essential functions of her position and continuing McBee's employment posed a serious threat to her health. The district court granted summary judgment for Team, and the court of appeals affirmed. McBee v. Team Indus., Inc. , 906 N.W.2d 880 (Minn. App. 2018). We agree that the Act does not mandate an interactive process. But genuine factual disputes regarding the essential functions of McBee's employment and Team's serious-threat defense preclude summary judgment. We therefore affirm in part, reverse in part, and remand to the district court for trial.
FACTS
Team is an engineering and manufacturing company with a plant in Detroit Lakes. This plant includes a foundry and aluminum-die-casting facility employing approximately 90 people. McBee was a full-time "operator" (or "cell member"), which involved working on the die-casting production line. As the district court described her employment duties, "McBee would pick a part up from a conveyor belt, pound trim off the part, put it on the trim press, and once completed, put it in a carrier of parts (called a 'gaylord') to be picked up by a forklift."
On March 10, 2015, McBee met with a neurosurgeon, reporting dizziness and loss of balance. In an answer to an interrogatory, McBee stated that she suffered from "vertebrate disc narrowing, a bulged disc or discs in her neck and back, and bone spurs in her vertebrae," which caused her "severe pain and numbness." The doctor discussed possible surgery options with McBee and issued a 10-pound lifting, pulling, or pushing restriction. The doctor also recommended that she "not bend her neck up."
That evening, McBee reported for her shift and showed a Team "shift lead," McBee's immediate supervisor, the doctor's note. The shift lead told McBee to discuss it with the nightshift supervisor. McBee then told the nightshift supervisor that her physician warned her that "looking up" could cause paralysis. She was informed that she may have to go home, but instead was assigned to a different machine and worked a full shift that night without incident.
The following night, the nightshift supervisor met with McBee before her shift began. McBee gave him emergency contact information. The nightshift supervisor told McBee that Team's human resources manager wanted to see her.
The human resources manager recalled that McBee "was very shook up about becoming paralyzed," "very emotional,"
*225 and "crying" during this meeting. McBee recalled, "I told him I had a 10-pound weight restriction, and I explained to him that the doctor had stated to me that looking up could risk paralysis." McBee also recalled that her doctor said that she should be in a neck brace, but he would not give her one because she was driving by herself. According to McBee, the human resources manager responded by telling her that she was a "huge insurance liability" and that, until her 10-pound restriction was lifted, "if you just happen to magically appear on machines 3, 4, and 5 until surgery and after your 10-pound weight restriction is lifted, then that's how it will be." McBee testified in her deposition that these machines "constantly" ran parts under 10 pounds. She was then sent home and did not work her shift.
The next day, Team terminated McBee's employment. She talked with the human resources manager over the phone, informing him that she had followed up with the neurosurgeon, who had clarified that she could work as long as she followed the weight restriction. The human resources manager told her that he had discussed the matter with Team's plant manager. Because of the danger of injury, she could no longer work for Team.
McBee brought an action that included a claim for failure to accommodate her disability[1] in violation of the Minnesota Human Rights Act, Minn. Stat. §§ 363A.01 -.44.[2] Team moved for summary judgment. As relevant here, McBee and Team disagreed as to whether the Act requires an employer to engage in an interactive process with an employee seeking accommodation, whether McBee could perform the essential functions of a cell member with reasonable accommodation, see Minn. Stat. § 363A.08, subd. 6, and whether her continued employment posed a serious threat to her health, see Minn. Stat. § 363A.25.
McBee relied on the deposition testimony of Team's shift lead to argue that she could perform the essential functions of her position with reasonable accommodation. The shift lead, with over 4 years' experience at Team in this role, had previously worked as an operator at Team and was familiar with the duties and responsibilities of Team operators. In his words, his job was to "[m]onitor the machines, make sure everything is running as it should, make sure operators are doing what they're supposed to be doing, answering questions for them, [and] making program changes to make better parts."
The shift lead testified that someone with a 10-pound restriction "could" work her shift, but she would have an "issue" with changing ram tips. A "ram tip" is a "big piece of copper that is used to push the metal into the part that attaches to the end of a ram." It weighs between 3 and 30 pounds. A ram tip screws into a "shot ram," which weighs between 30 and 150 pounds. The shot ram sometimes must be lifted off a machine when a tip is changed. According to the nightshift supervisor, operators set the ram in a chain vice and use an "18- to 20-inch pipe wrench, [which] probably weighs 15 pounds," to unscrew the tip. Removing the shot ram from the *226 machine and carrying it to the vice is simply a matter of "[b]ull labor."
Another operator testified that she changed ram tips eight to ten times in the last year. She testified that "approximately 50 percent" of the time she had help when changing tips on smaller die-casting machines, and she always received help on the bigger machines. She had never been turned down on a request for assistance. McBee testified that she changed ram tips twice during her tenure of about six months with Team. The shift lead testified that ram-tip changes happen two to three times a week. He testified that it is part of his job to help with this task when asked.
In addition to receiving help changing ram tips, the shift lead testified, an employee with a 10-pound restriction also would "possibly" need help cleaning the pit beneath the die-casting machine. Cleaning involved scooping up scrap left on the floor or in the "pits" under the machine. Another operator explained how she cleaned: "I take the big parts out first. And then I take a rake, and I go underneath, and I pull everything out to where I can get at it. And then I put it in a shovel, and I throw it in a [d]umpster." Team's occupational therapist reported that an operator "needs to clean the pit at each machine at least once per week, although the frequency varies greatly depending on the parts being run."
The shovels used to clean the pits weigh 4.5 pounds when empty. Team's occupational therapist concluded that shovels "are regularly loaded with over 6 pounds of debris bringing the total loaded weight to over 10 pounds." McBee stated that she could not discern whether something was over 10 pounds by picking it up because "my arms aren't a scale," and she could not say exactly how many parts she normally shoveled at a time "because each scoop is different." Another operator testified that cleaning involved more than 10 pounds, because "you've got all kinds of little tiny metal shavings full of quench and full of the lube. So when you get all that together, it's a wet mess." The shift-lead testified: "Sometimes you're going to get a shovelful that can weigh from 10 to 20 pounds" because of "scrap and ... oil [and] grease." But he also agreed that an operator could scoop smaller loads and lift less at a time.
Team pointed to other activities that exceeded McBee's restriction, for example, pushing gaylords, the containers in which finished parts were placed. One of Team's job descriptions stated that carts require 30-pound push or pull force to move with the gaylord on top of them. The Team occupational therapist indicated that gaylords "frequently require push/pull force in excess of 50 pounds to move even one inch." Team's nightshift supervisor said, "[Y]ou can't tell me you're not exerting 20 pounds or better effort pushing that 30-pound cart that's empty."
When a gaylord is filled, the carts are pushed out into an aisle where a forklift can pick them up, usually a distance of about 5 feet. The shift-lead testified that gaylords are filled up "[e]very couple hours," around three or four times a shift. McBee testified that "[i]t really depended on the part you were running during that shift. Sometimes you didn't push them at all, other times maybe once or twice a shift, other times more frequent ... than that." She added after, however, that she "did at one point in time have a 20-pound weight restriction that [Team] accommodated with no issues."
Other activities implicating more than 10 pounds were compiled by the occupational therapist. These tasks included moving anti-fatigue mats, rolling torches, carrying loads of lube and quench, and sweeping. According to the report, the time an operator *227 spent on tasks involving lifting in excess of 10 pounds totaled 102 to 339 minutes per day. Additionally, a Team job description listed the "Essential Functions" of McBee's position as including the "[a]bility to lift 50 pounds."
Beyond the reasonable-accommodation disagreement, the parties disputed whether continued employment at Team posed a serious threat to McBee's health. Central to this issue is the deposition testimony of McBee's neurosurgeon. The doctor tempered McBee's initial "looking up" comments and testified in his deposition, as relevant here: "[I]f her deficits were so profound that I was concerned about her safety, then I would have probably admitted her from the clinic to the hospital and operated on her." He added, "You don't just become paralyzed. The risk of paralysis, in her situation, would be abrupt movement of [her] neck in a certain direction that would compromise the spinal cord and make it worse." He testified, "[Y]ou can't simply make that blanket statement that anybody who has spinal cord compression cannot work in a foundry, as long as the patient is aware that the compression is there and is aware of her limitation...."
The district court granted summary judgment to Team. It held that the Minnesota Human Rights Act "does not require an employer to engage in an interactive process to determine whether a reasonable accommodation is possible." Further, it held that McBee could not perform the essential functions of her position with reasonable accommodation. According to the district court: "While there is a legitimate dispute over the amount of work that would require sudden neck movements and lifting over ten pounds, the Defendant has successfully proven that no matter where she was assigned, some of the physical labor would necessarily be beyond what her doctor recommended." The district court also granted Team summary judgment on the serious-threat defense. The court of appeals affirmed. McBee , 906 N.W.2d at 886. We granted McBee's petition for review.
ANALYSIS
McBee argues that it was error to grant Team's reasonable-accommodation summary judgment motion for three reasons. First, Team failed to engage in an interactive process, which, she asserts, is required under the Minnesota Human Rights Act. Second, McBee could perform the functions of her position with reasonable accommodation. Third, McBee's continued employment at Team did not pose a serious threat to her health.
We review summary judgment decisions de novo. Allen v. Burnet Realty, LLC , 801 N.W.2d 153, 156 (Minn. 2011). We ask whether there are any genuine disputes as to material fact and "whether the lower courts erred in their application of the law." N. States Power Co. v. Minn. Metro. Council , 684 N.W.2d 485, 491 (Minn. 2004).
Our analysis involves interpretation of the Minnesota Human Rights Act. Statutory interpretation is also reviewed de novo. Harstad v. City of Woodbury , 916 N.W.2d 540, 545 (Minn. 2018). The goal of all statutory interpretation "is to ascertain and effectuate the intention of the legislature." Minn. Stat. § 645.16 (2018). "When legislative intent is clear from the statute's plain and unambiguous language, we interpret the statute according to its plain meaning without resorting to other principles of statutory interpretation." City of Brainerd v. Brainerd Invs. P'ship , 827 N.W.2d 752, 755 (Minn. 2013).
I.
We first address whether the Minnesota Human Rights Act required *228 Team to engage with McBee in an interactive process to seek reasonable accommodations for her disability. As discussed more fully below, the Act states that "it is an unfair employment practice for an employer ... not to make reasonable accommodation to the known disability of a qualified disabled person ... unless the employer ... can demonstrate that the accommodation would impose an undue hardship...." Minn. Stat. § 363A.08, subd. 6(a). McBee argues that this section "statutorily codifies an affirmative obligation-a requirement-on employers to take steps to determine possible accommodations, including consulting with the employee, and then documenting those good-faith efforts."
McBee also acknowledges the specific term "interactive process" does not appear in the text of the Minnesota Human Rights Act but rather appears in regulations and interpretive guidance under the Americans with Disabilities Act, 42 U.S.C. §§ 12101 - 213 (2012). The federal regulation that McBee cites defines the "interactive process" requirement:
To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.
29 C.F.R. § 1630.2(o)(3) (2018). The interactive process requirement has been interpreted to mean that "an employer must converse or interact with [an] individual about the availability of a reasonable accommodation" and "must make a good faith effort to assist the employee in finding an accommodation." See Faulkner v. Douglas County , 906 F.3d 728, 733 (8th Cir. 2018).
"In the past, we have found interpretations of federal anti-discrimination statutes useful to guide our interpretation of the [Minnesota Human Rights Act] when the ... provisions in question are similar to provisions of the federal statutes." Kolton v. County of Anoka , 645 N.W.2d 403, 407 (Minn. 2002). "When provisions of the [Minnesota act] are not similar to provisions of federal anti-discrimination statutes, however, we have departed from the federal rule in our interpretation of the [Minnesota act]." Id. Here, McBee does not point to a state law similar to the federal regulation. Because the Minnesota Human Rights Act and the federal regulation are dissimilar in this regard, we decline to follow federal precedent on this issue.[3]
To understand why the federal and state approaches are not similar, we turn to McBee's argument. McBee claims that the plain language of the Minnesota Human Rights Act mandates an interactive process. McBee's starting point is the definition of a reasonable accommodation: "steps which must be taken to accommodate the known physical or mental limitations of a qualified disabled person." Minn. Stat. § 363A.08, subd. 6(a). " 'Steps ... to accommodate,' " she argues, "can only be interpreted as including ... what is typically referred to as the 'interactive process.' " According to McBee, the word *229 "must" makes these interactive "steps" obligatory.
That these "steps" mean a mandatory "interactive process" is particularly evident, McBee argues, when read in context with statutory language describing the undue-hardship defense. "In determining whether an accommodation would impose an undue hardship[,] ... factors to be considered include ... documented good faith efforts to explore less restrictive or less expensive alternatives, including consultation with the disabled person or with knowledgeable disabled persons or organizations." Minn. Stat. § 363A.08, subd. 6(b)(5) (emphases added). McBee asserts that "documented good faith efforts" are equivalent to an "interactive process," and this section specifically states "consultation with the disabled person" rather than "consultation with the qualified disabled person." This analysis indicates that "documented good faith efforts" and "consultation with the disabled person"-i.e., an "interactive process"-is required regardless of whether the disabled person is "qualified." Thus, McBee concludes, an employer must consider reasonable accommodation and must undergo an undue-hardship analysis regardless of whether that employee is "qualified." According to McBee, undue-hardship analysis, and thus an interactive process, is mandatory.
We disagree. McBee's reading mistakes the exception for the rule. As the statute plainly provides, demonstration that an accommodation would pose an undue hardship is unnecessary unless the employer is first obligated to make the accommodation. "[I]t is an unfair employment practice ... not to make reasonable accommodation to the known disability of a qualified disabled person ... unless the employer ... can demonstrate that the accommodation would impose an undue hardship." Minn. Stat. § 363A.08, subd. 6(a) (emphasis added). The word "unless" functions to make undue hardship an exception to the rule that qualified employees must be reasonably accommodated. In re Smith's Estate , 131 Cal. 433, 63 P. 729, 729 (1901) ("The section in question consists of two clauses connected by the conjunction 'unless,' which, as said by Lord Mansfield ... 'means the same as "except," and hence implies merely an exception to the first clause.' " (citations omitted)). As an exception, undue hardship and the accompanying "interactive process" analysis is not mandatory, and demonstration of an interactive process is not, as McBee argues, an affirmative statutory obligation. To hold otherwise would make the word "unless" meaningless, an outcome normally disfavored in statutory interpretation. See State v. Wilson , 830 N.W.2d 849, 853 (Minn. 2013) ("[W]e interpret the statute in a manner that renders no part of it meaningless.").
Even if we were to conclude that McBee's theory that "documented good faith efforts" are equivalent to an "interactive process" is correct-a question we need not, and do not, resolve here-an "interactive process" at most would apply to the undue-hardship defense. Therefore, we hold that the Minnesota Human Rights Act does not mandate that employers engage employees in an interactive process to determine whether reasonable accommodations can be made. See City of Brainerd , 827 N.W.2d at 756 (explaining that when the Legislature uses language in one section and omits it in another, we regard the omission as intentional and do not add those words to other sections).[4]
*230 II.
We next address whether genuine issues of fact preclude summary judgment on McBee's reasonable-accommodation claim. When a motion for summary judgment is made and supported, the nonmoving party must present facts showing that there is a genuine issue as to a material fact. DLH, Inc. v. Russ , 566 N.W.2d 60, 69 (Minn. 1997). A genuine issue of material fact may not be established by "unverified and conclusory allegations" or "metaphysical doubt about the facts." Dyrdal v. Golden Nuggets, Inc. , 689 N.W.2d 779, 783 (Minn. 2004). A genuine issue of material fact "must be established by substantial evidence." DLH, Inc. , 566 N.W.2d at 69-70 (citation omitted) (internal quotation marks omitted). We view the evidence in the light most favorable to the party against whom summary judgment was granted. Doe v. Archdiocese of Saint Paul & Minneapolis , 817 N.W.2d 150, 163 (Minn. 2012).
Employers with the requisite number of employees generally are required "to make reasonable accommodation to the known disability of a qualified disabled person." Minn. Stat. § 363A.08, subd. 6 ; see also Hoover v. Norwest Private Mortg. Banking , 632 N.W.2d 534, 547 (Minn. 2001). The parties dispute whether McBee was a "qualified disabled person." " 'Qualified disabled person' means ... a disabled person who, with reasonable accommodation, can perform the essential functions required of all applicants for the job in question." Minn. Stat. § 363A.03, subd. 36(1).
Two concepts-"reasonable accommodation" and "essential functions"-require further definition. The first concept is expressly defined by Minnesota law. " 'Reasonable accommodation' means steps which must be taken to accommodate the known physical or mental limitations of a qualified disabled person." Minn. Stat. § 363A.08, subd. 6(a). The second concept, "essential functions," means those functions "required of all applicants for the job in question." Minn. Stat. § 363A.03, subd. 36(1). The concept is not further defined by Minnesota law, but because federal discrimination law tracks the text of Minnesota law on this point, we agree with the court of appeals that federal precedent interpreting similar statutory language is persuasive.[5] Kolton , 645 N.W.2d at 407.
Generally, "essential functions" are "the fundamental job duties of the *231 employment position...." 29 C.F.R. § 1630.2(n)(1) (2018). The concept "does not include the marginal functions of the position." Id. In determining whether a function is "essential," we may consider such factors as:
(1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; and (5) the current work experience of incumbents in similar jobs.
Moritz v. Frontier Airlines, Inc. , 147 F.3d 784, 787 (8th Cir. 1998) (citation omitted) (internal quotation marks omitted).
McBee relies on the testimony of Team's shift lead to establish that, with reasonable accommodation, she could perform all the essential functions of the position. The shift lead testified that an operator could work McBee's shift with a 10-pound restriction. But he also testified that someone in this position would have an issue with two activities: changing ram tips and cleaning out the pits. We construe this testimony as evidence that McBee could perform the fundamental functions of an operator, with the exception of changing ram tips and cleaning out the pits. See Doe , 817 N.W.2d at 163 (stating that we view the evidence in the light most favorable to the party against whom summary judgment was granted).
Even assuming the two challenging tasks identified by the shift lead are essential functions, we conclude that the record reflects a genuine dispute of material fact as to whether reasonable accommodation would allow McBee to perform those tasks. We base our conclusion on the following evidence. McBee testified that she changed ram tips only twice during her six months with Team. Another operator testified that she changed tips eight to ten times in the last year. Although Team cites Moritz , 147 F.3d at 788, and argues that an employer is not obligated to reassign existing employees to accommodate their disabilities, we observe that Team previously has provided assistance with changing ram tips. For example, one of its operators testified that she has received assistance 50 percent of the time when changing tips on the smaller die-casting machines. The operator further testified that she had never been turned down when she asked for help. The shift lead also testified that his duties included providing such assistance. Although a reasonable amount of assistance may not allow McBee to change ram tips given her lifting restriction and the weight of ram tips and shot rams, we cannot conclude that Team is entitled to summary judgment on this ground.
As to cleaning, evidence in the record demonstrates that McBee either could have been reasonably accommodated or may have needed no accommodation at all. Team insisted that McBee could not perform this task because "the shovel weighed 4.5 pounds empty, and the addition of even a few pounds of scrap metal put the total weight over McBee's 10 pound weight limit." Because an average shovelful was over 6 pounds, Team contends that McBee would overshoot her restriction if she made regular use of the shovel. In response, McBee argued that "lighter shovels exist, and it is disingenuous for Respondent to argue 5-pound shovels are necessary"-"someone could put less in their shovel," and someone with a restriction "might just use the shovel to lift less at a time." But, Team countered, "McBee had no way to determine whether any shovel laden with that scrap would exceed her weight limit" because, McBee said, "my arms aren't a scale," and "each scoop *232 is different." Team argued before the district court that the result would be that McBee "gets down on her hands and knees, she picks up the parts one at a time and she spends 45 minutes doing a job that should only take 20," and "that is not reasonable."
"[W]e are not a factfinding body...." Zubryski v. Minneapolis St. Ry. Co. , 243 Minn. 450, 68 N.W.2d 489, 490 (1955). The selection of shovels, the weight of a loaded shovel, and the reasonable length of an operator's cleaning time are fact issues that we are in no position to resolve on this record. Construed most favorably to McBee, see Doe , 817 N.W.2d at 163, the testimony of the shift lead is substantial evidence that McBee could perform the essential functions of her job with or without reasonable accommodation.
Team argues that the testimony of the shift lead should come with the caveat that a "shift lead is not a supervisory position" and that the shift lead "had no authority for hiring, firing, or scheduling." We note the tension between this argument and the testimony of the shift lead that his job duties included "mak[ing] sure everything is running as it should" and "mak[ing] sure operators are doing what they're supposed to be doing." Regardless, whatever the shift lead may have lacked in formal supervisory authority, he had in first-hand knowledge of the work of operators. The shift lead, with more than 4 years' experience at Team in this role, had worked previously as an operator at Team and was familiar with the duties and responsibilities of Team operators. His testimony is legally relevant. See Moritz , 147 F.3d at 787 (considering "the current work experience of incumbents in similar jobs"). How much weight to give the shift lead's testimony is a question for the factfinder.
Team also argues that lifting 10 pounds in itself was an essential function of McBee's position, and both the district court and the court of appeals agreed. If true, McBee would not be "qualified" as a matter of law. See Denson v. Steak 'n Shake, Inc. , 910 F.3d 368, 371 (8th Cir. 2018) (stating that " '[t]he ADA does not require an employer to permit an employee to perform a job function that the employee's physician has forbidden' " (quoting Alexander v. Northland Inn , 321 F.3d 723, 727 (8th Cir. 2003) )). Team's judgment that operators must lift more than 10 pounds is legally relevant.[6] See Moritz , 147 F.3d at 787 (noting the relevance of the "employer's judgment"). Team also points to its written job description stating that lifting 50 pounds was an essential function and to a report of its occupational therapist calculating that 10-pound-plus activities, such as pushing gaylords, accounted for 102 to 339 minutes of an operator's day. These facts also are legally relevant. See id. (noting relevance of job descriptions and time required to perform job duties).
But we view the facts in a light favorable to McBee, see Doe , 817 N.W.2d at 163, and McBee testified that she was previously accommodated with a 20-pound restriction. This fact calls into question Team's reliance on its job description. If lifting 50 pounds were truly essential, then McBee's past accommodation would not have been possible.
On balance, even though Team's judgment and calculation about the frequency of 10-plus-pound tasks weigh against McBee, the testimony of the shift *233 lead and McBee herself is substantial evidence that weighs in her favor. Mindful of the summary judgment standard, we conclude that a genuine dispute of material fact exists over whether McBee was a "qualified disabled person" under Minn. Stat. § 363A.03, subd. 36(1). The dispute is " 'established by substantial evidence,' " DLH, Inc. , 566 N.W.2d at 69-70, beyond mere "metaphysical doubt about the facts" and "unverified and conclusory allegations" on the part of McBee, Dyrdal , 689 N.W.2d at 783. Thus, we hold that summary judgment in favor of Team on McBee's reasonable-accommodation claim was error.
III.
Finally, we address Team's serious-threat defense.
It is a defense to a complaint or action brought under the employment provisions of this chapter that the person bringing the complaint or action has a disability which in the circumstances and even with reasonable accommodation ... poses a serious threat to the health or safety of the disabled person or others.
Minn. Stat. § 363A.25. The employer may satisfy the standard by establishing that it relied on competent medical advice. See Lewis ex rel. Welles v. Metro. Transit Comm'n , 320 N.W.2d 426, 430 (Minn. 1982).
Team offers no medical evidence of its own to support a claim that a serious threat existed to McBee's health or safety. Team relies solely on McBee's self-reported paralysis risk and her doctor's testimony. But McBee's admittedly "very shook up," "very emotional," "crying" statement that she could be paralyzed just by "looking up" is not competent medical advice. McBee clarified that she could work as long as she followed the weight restriction. Moreover, McBee's doctor expressly disclaimed the more dramatic version of paralysis risk first given by McBee, stating, "[Y]ou can't simply make that blanket statement that anybody who has spinal cord compression cannot work in a foundry, as long as the patient is aware that the compression is there and is aware of her limitation." Given the disputes of fact in the record at this stage of the proceedings, it was error to grant summary judgment in favor of Team that there was a "serious threat to the health or safety" of McBee.
CONCLUSION
For the foregoing reasons, we affirm that part of the court of appeals' decision that held that an interactive process between an employer and an employee seeking accommodation for a disability is not required by the Minnesota Human Rights Act. We otherwise reverse the decision of the court of appeals because we hold that factual disputes preclude summary judgment, and we remand to the district court for trial.
Affirmed in part, reversed in part, and remanded.

The parties do not dispute here that McBee's spinal condition amounted to a "disability" within the meaning of the Act. See Minn. Stat. § 363A.03, subd. 12.

McBee's other claims included unlawful discharge in violation of the Minnesota Human Rights Act, see Minn. Stat. § 363A.08, subd. 2(2), reprisal under the Minnesota Human Rights Act, see Minn. Stat. § 363A.15, and obstruction of workers' compensation benefits under the Minnesota Workers' Compensation Act, see Minn. Stat. § 176.82, subd. 1 (2018). These claims are not before us.

The United States Court of Appeals for the Eighth Circuit has held that an interactive process is required under the Minnesota Human Rights Act, Burchett v. Target Corp. , 340 F.3d 510, 517 (8th Cir. 2003), but a federal interpretation of state law is not binding on our court. "[S]tate courts are the ultimate expositors of state law...." Mullaney v. Wilbur , 421 U.S. 684, 691, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975).

Nevertheless, in many cases, an employer may avoid communicating with an employee seeking accommodation at its own peril. As a practical matter, thorough communication may be the only way to determine whether the employee could be reasonably accommodated-and for the employer to avoid liability.
The Minnesota Human Rights Act is not ambiguous on this point, and so we reject the request of the Minnesota Department of Human Rights to defer to its interpretation of the Act to reach the opposite result. "[W]e owe no deference to an agency's interpretation of an unambiguous statute." Schwanke v. Minn. Dep't of Admin. , 851 N.W.2d 591, 594 n.1 (Minn. 2014). In light of this holding, we dismiss as moot Team's pending motion to strike portions of the Commissioner's amicus brief and addendum. Cf. Granville v. Minneapolis Pub. Schs., Special Sch. Dist. No. 1 , 732 N.W.2d 201, 209 (Minn. 2007).
McBee also argues that the court of appeals "based its analysis on a false premise" when it stated that "the ADA predates the MHRA." See McBee , 906 N.W.2d at 887. Although McBee challenges the factual accuracy of the timeline offered by the court of appeals, our statutory interpretation review is de novo, Harstad , 916 N.W.2d at 545, and resolving the timing issue is unnecessary to our plain language analysis.

Compare Minn. Stat. § 363A.03, subd. 36(1) (" 'Qualified disabled person' means ... a disabled person who, with reasonable accommodation, can perform the essential functions required of all applicants for the job in question." (emphasis added)), with 42 U.S.C. § 12111(8) ("The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." (emphasis added)).

We need not, and do not, decide whether an employer can impose an "essential" requirement that an employee be able to lift a certain amount of weight without directly tying that requirement to specific functions of the job.